STATE of Texas, Appellant,

ex rel. GRIMES COUNTY TAXPAYERS
ASSOCIATION et al., Relators,

v.

TEXAS MUNICIPAL POWER AGENCY
et al., Appellees.

·No. 17079.

Court of Civil Appeals of Texas,
Houston (1st Dist.).

March 2, 1978.

Rehearing Denied March 30, 1978.

Joe S. Falco, Jr., County Atty., Navasota, Sears & Burns, Will Sears, Robert L. Burns, Houston, for appellant State of Texas.

Davis, Davis, Durham & Schulze, Charles Davis, Huntsville, Naman, Howell, Smith, Lee & Muldrow, Hilton H. Howell, Albert Witcher, Roy L. Barrett, Waco, for appellee Texas Municipal Power Agency.

Pete Eckert, City Atty., Merril E. Nunn, Asst. City Atty., Garland, for appellee City of Garland, Texas.

Joel V. Roberts, City Atty., Bryan, for appellee City of Bryan, Texas.

Paul C. Isham, City Atty., James A. Blanton, Asst. City Atty., Denton, for appellee City of Denton, Texas.

Donald A. Parks, City Atty., Greenville, for appellee City of Greenville, Texas.

COLEMAN, Chief Justice.

The State of Texas, acting by and through Joe S. Falco, County Attorney of Grimes County, Texas, on the relation of Grimes County Taxpayers Association and others, filed an original information in the nature of a quo warranto in the District Court of Grimes County, Texas, complaining of the Texas Municipal Power Agency, hereinafter referred to as TMPA. The information questioned the legal existence of TMPA and the validity of various actions taken by it.

TMPA filed an original answer and a motion for summary judgment with supporting affidavits and set a hearing thereon. Each of the cities of Bryan, Greenville, Denton and Garland filed a plea of intervention alleging that the intervenor "adopts the allegations of defendant's original answer and joins in defendant's motion for a summary judgment." The State then filed its first amended original information seeking relief against TMPA and the four cities.

A hearing was held on TMPA's motion for summary judgment, and the trial court rendered a judgment which decreed the defendants not guilty of the charges alleged by the State, granted defendants' motion for a summary judgment and decreed that all charges made by Plaintiff and Relators against all defendants and all relief requested by Plaintiff and Relators against all defendants be denied. This appeal resulted. We affirm.

The Texas Municipal Power Agency was created by concurrent ordinances adopted by the cities of Bryan, Denton, Garland and Greenville on July 18, 1975, as authorized by Article 1435a, Section 4a, Texas Revised Civil Statutes. Each of the cities was engaged in the generation of electricity to supply electric power to its inhabitants through the city-owned, gas-fired generating plants. The demands on the cities' electric systems had almost quadrupled in the prior eleven years. The cities feared that because of a Railroad Commission order requiring curtailment of the use of natural gas as a boiler fuel beginning January 1, 1981, the electric generating facilities of the city would no longer be able to produce the electricity necessary to fill the needs of the inhabitants of the cities.

The cities determined that their need for electricity could best be met by the use of a generating facility using lignite coal as fuel. The cities created the TMPA in order that that entity could issue bonds and construct a facility to generate electricity. A supply of lignite for fuel was located in Grimes County, Texas. In August, 1976, the Grimes County project was adopted. This project envisioned the construction of a generating plant in Grimes County. In the Fall of 1976, the TMPA issued and sold Fifty Million Dollars in bonds. Work on the project was in progress at the time this suit was filed.

The trial court did not commit reversible error by refusing to postpone or continue the hearing on the motion for a summary judgment which was set for September 14, 1977, in order to provide the State an opportunity for discovery. The cause of action was filed by the appellants on July 25, 1977; and the motion for summary judgment was filed on August 9, 1977, by TMPA. At that time, the court set a hearing on the motion for September 6, 1977, almost three weeks more than the rules require. The cities filed their pleas in intervention, answering and joining in the motion for summary judgment more than ten days before the date set for the hearing. On September 6, the day of the hearing, appellants filed an amended information with leave of court and the hearing was postponed until the 14th day of September. Briefs on the points raised by the amended information were filed on behalf of all parties prior to the hearing.

When the case was called for trial, appellants announced ready to proceed with the argument but requested the right to supplement the summary judgment evidence. The trial court advised that it was going to commence the hearing and after the law was developed, if the court felt that there was material summary judgment proof needed which appellants had not had the opportunity to obtain, the court would continue the hearing until they had an opportunity to obtain it. After the issues had been argued to the court, it considered all of the points, including points raised for the first time in the amended information, and granted summary judgment in favor of the agency and the cities.

The contention of appellants is that the act under which the agency was created is unconstitutional, that certain activities of the agency and the cities are unconstitutional, and that others exceed the powers granted these political subdivisions by law. These contentions appear to raise questions of law for decision by the court. No questions of fact were suggested to this court either in the briefs or at oral argument. The record contains pleadings, deposition testimony, numerous other documents and affidavits which establish as a matter of law that the provisions of the statute authorizing the creation of the agency have been properly complied with and that all of the necessary prerequisites to the subsequent validating acts have been met.

■ The appellants failed to file an affidavit, as authorized by Rule 166–A(f), stating reasons why they were unable to present by affidavit the facts essential to justify their opposition. Had such an affidavit been filed, the court would have been authorized to refuse the application for a judgment and/or to order a continuance to permit discovery to be had.

■ If an application for continuance fails to conform to the provisions of the rule regulating continuances, the granting of relief is within the sound discretion of the trial court. *Watson v. Godwin,* 425 S.W.2d 424 (Tex.Civ.App.—Amarillo 1968, writ ref'd n. r. e.). No facts are presented which demonstrate that the trial court abused its discretion in requiring appellants to proceed to trial in this case. *Traweek v. Radio Brady, Inc.,* 441 S.W.2d 240 (Tex.Civ.App.—Austin 1969, writ ref'd n. r. e.).

The appellants also assert in their brief that the judgment is interlocutory and unappealable because the judgment granted summary judgment as to the four cities intervening in the cause although they did not file separate motions for summary judgment. Each of the cities merely filed pleadings joining in the motion filed by

TMPA. Appellants' argue that the judgment is ineffective as to the cities and therefore does not dispose of all of the parties. This contention will not be sustained. The judgment expressly disposes of all the parties. Whether the court was in error in so doing is an issue to be determined.

Prior to the adoption of our present rules of civil procedure, it was held that an intervenor could adopt the pleadings of one of the original parties to the suit. *Texarkana and Ft. S. Ry. Co. v. Hartford Ins. Co.,* 17 Tex.Civ.App. 498, 44 S.W. 533 (1897, writ ref'd). Rule 58, T.R.C.P. provides that statements in a pleading may be adopted by reference in a different part of the same pleading or in another pleading or in any motion so long as the pleading adopted has not been superceded by an amendment. Each of the intervening cities filed an answer in which they specifically adopted the allegations of TMPA's answer and "joined in" the motion for a summary judgment. By joining in the motion, the intervenors have sufficiently adopted the allegations of the motion for a summary judgment.

The intervenors have sufficiently complied with Rule 166–A, supra, which permits either a plaintiff or a defendant to move for summary judgment, at any time after the adverse party has answered, with or without supporting affidavits. The motion for summary judgment must state specific grounds therefore. The intervenors' petition was served on the appellant more than ten days prior to the date set for the hearing on the motion. Since the intervenors joined in the motion filed by TMPA, they were parties to the subsequent procedural steps taken by TMPA. The appellants failed to object to the procedure adopted by the intervenors in presenting their motion for summary judgment. These procedural deficiencies do not present reversible error. *Youngstown Sheet and Tube Company v. Penn,* 363 S.W.2d 230 (Tex.1962); *Spray v. Stash,* 523 S.W.2d 262 (Tex.Civ.App.—Eastland 1975, writ ref'd n. r. e.); *Wiseman v. Horn,* 309 S.W.2d 253 (Tex.Civ.App.—Houston 1958, no writ histo-

ry); *Navarro v. Secret Harbor Farms,* 506 S.W.2d 337 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n. r. e.).

The principal points raised by appellants are (1) whether the statute authorizing the formation of the power district, Article 1435a, § 4a, Vernon's Annotated Civil Statutes, is constitutional and (2) whether certain of appellees' contracts and activities are unlawful. We first address the question of whether the cities, in executing and performing the power sales contract with TMPA, violated art. III, § 52 of the Tex. Const.

In 1963, the cities of Bryan, Garland and Greenville entered into an association with Brazos Electric Power Cooperative, Inc., a private corporation, to form the Texas Municipal Power Pool. In 1969, Denton joined the pool. The pool provided for inter-connections among the four cities and performed other functions. In 1970, the four cities and Brazos incorporated Texas Municipal Power Pool, Inc. (TMPPI), under the Texas Business Corporation's Act for profit. In 1975, Article 1435a was amended so as to authorize the creation of a municipal power agency.

Prior to the creation of TMPA, the four cities and Brazos had determined to create a municipal power agency and had determined that the mining area for the electric generating plant of the agency would cover certain selected areas in Grimes County. Prior to July 18, 1975, and during the year 1975, TMPPI, the four cities and Brazos, in contemplation of the creation of TMPA, had acquired more than 36 mineral leases in Grimes County. These leases were subsequently assigned to TMPA.

On July 18, 1975, each of the four cities enacted an ordinance creating a "joint powers agency" named the Texas Municipal Power Agency. The ordinances established the boundaries of TMPA to include only the territory within the corporate limits of the four cities. The ordinances provided for a governing board for the agency and the manner of filling the offices of directors of the board.

After the creation of TMPA, the four cities and TMPA, by contract, authorized Brazos to purchase a percentage of the ownership in the TMPA plant. On or about August 1, 1975, TMPA and Brazos organized Texas Power Pool, Inc., a non-profit corporation, to act as the operating arm of those two entities.

A year later, TMPA and the four cities executed a power sales contract, which requires the cities to purchase electric energy from TMPA, and to make payments to TMPA for various services to be performed by TMPA. The contract provides that the cities will make payments to TMPA in certain percentages if necessary to keep the required amount of funds in the bond fund of the agency, requires the cities to pay the operating and maintenance expenses of TMPA if its funds are insufficient, and compels each city, without further consideration, to permit TMPA to use its easements and streets.

Pursuant to the power sale contract and other contracts between TMPA and the four cities, the cities have paid not less than $344,000.00 to TMPA. Appellant contends that these payments were made without consideration and constitute unlawful donations of public funds. Appellants also assert that the effect of the power sales contract is to lend the credit of the cities to TMPA in order to allow it to issue and sell its bonds in the market place.

Art. III, § 52 of the Constitution of the State of Texas withdraws from the legislature the power to authorize any political subdivision of the state to lend its credit or to grant public money to any individual, association or corporation whatsoever. The purpose of this constitutional provision is to prevent the gratuitous application of public funds to private use. *Byrd v. City of Dallas,* 118 Tex. 28, 6 S.W.2d 738 (1928); *Brazoria County v. Perry,* 537 S.W.2d 89 (Tex.Civ. App.—Houston [1st Dist.] 1976, no writ).

■ There is a distinction between borrowing money and obtaining property or labor on credit. A municipal corporation has an implied power to use its credit for the accomplishment of any object for which it is authorized by law to expend money. The intervening cities have the authority to produce electricity for sale to their respective inhabitants. They therefore are authorized to contract with TMPA, or with private corporations, for the purpose of securing electric power for distribution to their inhabitants. In connection with such a contract, the cities are authorized to agree to pay for the services and product purchased. *San Antonio River Authority v. Shepperd,* 157 Tex. 73, 299 S.W.2d 920 (1957); *Brazos River Authority v. Carr,* 405 S.W.2d 689 (Tex.1966).

■ Many cases could be cited which involve an arrangement between two governmental entities in which one rendered agreed services to the other in exchange for money paid at a different time than when the services were rendered, or in which one agreed to pay off bonds or other indebtedness of the other. Two requirements must be met in such a transaction. (1) The purpose for which the obligation or payment or transfer was made must be within the powers of the entity incurring the obligation or making the payment or transfer of funds. *City of Aransas Pass v. Keeling,* 112 Tex. 339, 247 S.W. 818 (1923). (2) The political entity that receives the funds has to be obligated (by statute or contract) to use the funds for the public purpose. *Road District No. 4, Shelby County v. Alred,* 123 Tex. 77, 68 S.W.2d 164 (1934).

TMPA is obligated both under the contract and under the statute to use funds paid to it by the cities to acquire facilities for the production of electric power and to furnish electricity to the cities. The power sales contract does not violate the provisions of Article 3, Section 52 of the Texas Constitution. *Bexar County Hospital District v. Crosby,* 160 Tex. 116, 327 S.W.2d 445 (1959).

The payments made by the cities under the various contracts previously mentioned were not grants, donations or gratuities, but instead were payments made for services rendered and to be rendered. These payments do not offend against Article 3,

Section 52 of the Texas Constitution. *San Antonio River Authority v. Shepperd*, supra.

Section 4a, Article 1435a, Vernon's Annotated Civil Statutes (Acts 1975, 64th Leg., Ch. 143, P. 337) is not a local or special law enacted in violation of Section 56 of Article 3, Tex.Const.

Section 4a, supra, provides that public entities which were engaged in the generation of electric energy on the effective date of the act may form joint power agencies to act for them to achieve economies of size in the development of new sources of energy. Appellants contend that this provision establishes an impermissible classification rendering the act a local or special law enacted in violation of Section 56 of Article 3.

The purpose of Section 56 is to prevent the granting of special privileges and to secure uniformity of law throughout the State as far as possible. *Smith v. Davis*, 426 S.W.2d 827 (Tex.1968). It prohibits the passage of a local or special law in numerous specific areas and in instances where a general law could be made applicable.

■ A statute under constitutional scrutiny is to be construed as valid if reasonably possible. In a number of decisions, it has been said that a statute is not local or special within the meaning of the Constitution even though its enforcement or operation is confined to a restricted area, if persons or things throughout the State are effected thereby or if it operates upon a subject in which the people at large are interested. *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162 (1959).

■ The courts recognize in the legislature a rather broad power to make classifications for legislative purposes and to enact laws for the regulation thereof, even though such legislation may be applicable only to a particular class or effect only the inhabitants of a particular locality. However, such legislation must be intended to apply uniformly to all who may come within the classification designated in the act, and the classification must be broad enough to include a substantial class and must be based on characteristics legitimately distinguishing such class from others with respect to the public purpose sought to be accomplished by the proposed legislation. The classification must not be a mere arbitrary device resorted to for the purpose of giving what is, in fact, a local law the appearance of a general law. *Miller v. El Paso County*, 136 Tex. 370, 150 S.W.2d 1000 (1941).

■ The legislature may restrict the application of a law to particular municipalities by the use of classifications, providing the classifications are not arbitrary. There must be a reasonable relationship between the classification and the object sought to be accomplished by the statute. The ultimate test for whether a law is general or special is whether there is a reasonable basis for the classification and whether the law operates equally on all members within the class. In passing upon the constitutionality of a statute, it will be presumed that the legislature has not acted unreasonably or arbitrarily, and a mere difference of opinion, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable. The wisdom of the law is the legislatures' prerogative, not the courts'. *Smith v. Davis*, 426 S.W.2d 827 (Tex.1968).

Appellees suggest that there is a reasonable relation between the situation of the intervening municipalities, and the other municipalities similarly situated, in the purposes and objects to be attained by Section 4a of Article 1435a, supra. They suggest that the act is a part of a reasonable response by the legislature of Texas to the energy crisis facing this nation in 1975. The most crucial shortage involved petroleum products including natural gas. This problem was particularly acute in Texas as the past abundance of inexpensive natural gas had resulted in the production of most of the States' electrical energy by burning natural gas. Great problems for electric utilities were foreseeable. Based on hearings begun in 1975, The Railroad Commission of Texas issued an order requiring that

use in Texas of natural gas as a boiler fuel be phased out beginning in 1981.

A feasible substitute for natural gas as a source of fuel for electrical utilities is lignite coal which is found in considerable quantities in the State of Texas. The proposed Gibbons Street Creek Station will cost an estimated $460,000,000.

In an attempt to ease the transition to these costly plants, the legislature enacted Article 1435a, supra, to establish clearly that public and private entities could join together to own and operate power plants as co-tenants. This act was not entirely satisfactory since each entity was required to individually finance its portion of the costs of the construction and operation of the power plant. The failure of one entity to meet its obligations would have an adverse impact on the entire project. Section 4a was enacted in 1975 as a solution to this problem. It allowed public entities which were engaged in the generation of electrical energy on the effective date of the act to create a municipal power agency to own and operate a power plant. This agency would be able to obtain financing by issuing its bonds.

The 1975 legislature also realized that the energy crisis had created a need for the long term investment of huge sums in the utility area. The 1975 Legislature passed the Public Utility Regulatory Act, Article 1446c, Texas Revised Civil Statutes, as part of their effort to provide the stable atmosphere necessary to encourage long term investments. The act sought to provide such an atmosphere by providing for the certifying of service areas and facilities, providing for territorial integrity and avoiding the duplication of services. Volume 13, Hous.L.Rev. 1 (1975), "The 1975 Texas Public Utility Regulatory Act: Revolution or Reaffirmation".

Article 4a affects only 27 cities. The classification is closed. These cities are of various sizes and located geographically throughout the State. The legislation has state-wide effect and relates to a matter of state-wide interest. The development of the natural resources of Texas to insure the availability to its citizens of an adequate supply of electricity at an affordable cost was a matter of concern to the citizens of Texas in 1975, as it is today.

In 1975 all areas of the State were being provided with electrical energy. Some of the entities which provided this service distributed energy only while others both generated and distributed energy. Entities which generated their own energy had relied upon their own ability to secure the necessary power. No other entity had relied upon sales to these entities in planning for and building new plants.

All entities which only distributed energy were being supplied from someone else. These distributing entities relied on some other corporation, public or private, to supply them with energy and their energy suppliers relied upon these purchases in planning for and building new plants.

The classification in Article 1435a allowed entities which needed to be able to generate their own energy (those which were generating energy on the effective date of act) to continue to do so and to join together to do it more efficiently. At the same time, the limitation to municipalities which were generating energy on the effective date of the act avoided a disruption of the system through which distributing entities previously had received their energy. The classification is clearly related to the purpose of the act, the meeting of the future energy needs of the State.

The restrictions found in the act limiting the municipal power agency's sale of energy to those participating public entities and private entities who are joint owners with the agency of a generating facility was designed to prevent uncertainty and instability in the wholesale market. The cities which were generating energy on the date of the act had a large prior investment in generating facilities and personnel. Cities which were not generating electricity had no such investment. The Municipal Power Agency would supply the bulk of each city's energy need but the city would still be able to use its existing facilities and personnel at times of peak power use. These matters

point up the reasonable relationship of the classification to the purposes of the act.

The classification is in accord with the overall legislative policy in the utility area. The Public Utility Regulatory Act, Article 1446c, supra, and Section 4a were passed by the same legislature. Two of the purposes of the Public Utility Regulatory Act were to certify utility facilities to avoid duplication and to certify service areas to provide utilities with a secure base of energy demand that the utilities could rely on in planning and building future facilities. Both of these goals are furthered by denying the power to create a municipal power agency to cities not at the time of the passage of the Act engaged in the generation of electric power.

■■■ Section 4a of Article 1435a, supra, does not violate Article 3, Section 56 of the Constitution of the State of Texas since the classification created by the statute is reasonably related to the purpose of the law and the law operates equally on all within the class.

Section 4a permitted the creation of a new agency between the effective date of the Act, May 8, 1975, and January 1, 1977, by concurrent ordinances of the governing bodies of the public entities involved. After January 1, 1977, the creation of a new agency required the concurrent ordinances and also approval in a referendum in each of the entities involved. The Act also provides that an agency may be recreated by adding a new city between the date May 8, 1975, and April 1, 1976, by passage of an ordinance by both the new entity and the previously participating entities without an election. However, after April 1, 1976, an election was required before a new entity could be added to an existing agency.

These provisions do not create classifications within the meaning of Article 3, Section 56 of the Constitution. The provisions applied to all cities within the classification equally at the time the Act became effective.

Appellants urge that Article 1435a is unconstitutional because Section 4a of that Act grants a municipal corporation created under the Act "all of the powers which are by Chapter 10 of Title 28, Revised Civil Statutes of Texas, 1925, as amended, and this Act, conferred upon a public entity or entities, provided that such agencies shall not be authorized to engage in any utility business other than generation, transmission, and sale or exchange of electric energy . . . ." It is their contention that since both the agency and the cities exercise "essentially the same governmental powers" over the same territory, a master city has been created in violation of the Texas Constitution.

In support of this contention, appellants cite § 4, art. XI, Tex.Const. and § 5, art. XI, Tex.Const. Section 4 authorizes cities and towns with a population of 5,000 or less to be chartered by general law and imposes a limit on their taxing powers. Section 5 authorizes cities having more than 5,000 inhabitants to adopt home rule charters subject to such limitations as may be prescribed by the legislature. It provides that no charter or any ordinance passed under such order shall contain any provision inconsistent with the Constitution or the general laws of the State.

■■■ Two municipal corporations "cannot exercise the same general governmental authority over the same area." *City of El Paso v. State*, 209 S.W.2d 989 (Tex.Civ.App. —El Paso 1947, writ ref'd). There is no constitutional restriction, however, upon the overlapping of a special purpose municipal entity and a municipal entity with general governmental authority, even if some of their purposes may be the same. *City of Pelly v. Harris County Water Control and Improvement District No. 7*, 145 Tex. 443, 198 S.W.2d 450 (1946); *City of San Antonio v. Trease*, 243 S.W.2d 187 (Tex.Civ.App.— San Antonio 1951, writ ref'd).

In *City of Pelly v. Harris County Water Control and Improvement District No. 7*, supra, the city annexed territory which was also in a water control and improvement district and two different water conservation districts. The water districts contended that the city of Pelly could not extend its

jurisdiction over any of their territory because, as a municipal corporation, it could serve the same purposes as they were established to serve. The districts asserted that the annexation was void because both the city and the district could not function harmoniously in the "common orbit". The Supreme Court stated that they could not assume that the City of Pelly would attempt to take over the annexed territory in utter disregard for the water districts' constitutional and statutory powers and obligations, but instead would assume that the city would proceed amicably in an effort to adjust any conflicts by mutual agreement. The annexation was held valid.

In *Lower Nueces River Water Supply District v. Cartwright*, 274 S.W.2d 199 (Tex. Civ.App.—San Antonio 1954, writ ref'd n. r. e.), the court stated that the Supreme Court has held that districts created for special purposes, such as water control and improvement districts, water supply districts and the like, perform limited rather than general functions when compared to the older types of municipal organizations, such as cities. In this case, the water supply district sought to condemn land for a dam and reservoir site which lay within the boundaries of the Nueces River Conservation and Reclamation District. The court recognized that it was possible that a conflict of authority between the two districts may arise in the future, but stated that it should not be held in the absence of a definite statutory provision to that effect that the operations of one of these creatures of the legislature should be halted because of a possible conflict with the functions of another, particularly when the district is conducting no physical operations and exists only as a bare legal entity. The court held that the fact that the lands sought to be condemned lie in whole or in part within these two reclamation districts constitutes no legal impediment to the exercise of the power of eminent domain by the appellant district.

TMPA is a special purpose municipal entity. The Act under which it was organized specified that the purpose of the legislation was to make definite and secure the right and authority of entities, either public or private, which are engaged in the generation, transmission, or distribution of electric energy, to join together as co-tenants or co-owners in the planning, financing, acquisition, construction, ownership, operation, and maintenance of electric generating units and plants.

Section 4a states:

"In order to more readily accomplish the purposes of this Act, two or more public entities by concurrent ordinances may create a joint powers agency to be known as a municipal power agency, without taxing power, as a separate municipal corporation, a political subdivision of the state, and body politic and corporate, to have and exercise all of the powers which are by Chapter 10 of Title 28, Revised Civil Statutes of Texas, 1925, as amended, and this Act, conferred upon a public entity or entities . . . ."

 The powers granted to the agency were given in order that the agency could readily accomplish the purposes of the Act. Appellants contend that it permits the TMPA to exercise any power that the city could exercise (with some exceptions). The Act clearly does not grant such broad powers to TMPA. The first rule of statutory interpretation is to ascertain the legislative intent. *State v. Shoppers World, Inc.*, 380 S.W.2d 107 (Tex.1964). "The legislative intent is the thing to be ascertained; once found, it may rightly cut down the otherwise possible and apparent significance of the general terms employed." *Adams v. Rockwall County*, 280 S.W. 759 (Tex.Com. App.1926, judgmt. adopted). In *Moody v. San Saba County Water Control and Improvement District No. 1*, 293 S.W. 845 (Tex.Civ.App.—Austin 1927, writ ref'd), the court said:

"But in arriving at the legislative intent we are not of necessity confined to a consideration of the literal language of a particular section or portion of a section. If taking the section or act as a whole it fairly appears that the language under construction in the particular section was

used in a more limited or restricted sense than its literal interpretation would import, it is proper to so construe it and thus give effect to the legislative intent."

It is also the duty of this court to give the statute a construction or interpretation that would render it valid, if it is reasonably possible to do so. *Hamrick v. Simpler*, 127 Tex. 428, 95 S.W.2d 357 (1936).

The powers conferred by the statutory language under consideration are limited to those powers granted cities which are reasonably necessary to enable TMPA to accomplish the purpose for which it was created. *Hicks v. Texas Municipal Power Agency*, 548 S.W.2d 949 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.).

■ TMPA is a limited purpose municipal corporation. There is no constitutional reason why such a corporation cannot include within its boundaries cities, whether organized as general law cities or as home rule cities.

Appellants contend that Section 4a, Article 1435a, supra, is unconstitutional in that the legislature has no power to define and create a body politic and corporate as a municipal corporation which does not in fact and historically constitute a municipal corporation, but "is in fact an electric generating plant".

The term "municipal corporation" is not defined in the Texas Constitution. However, in Art. 11, § 3, Tex.Const., it is provided that "no county, city, or other municipal corporation . . .". Obviously the Constitution contemplates the formation of municipal corporations other than cities and towns. It has been held that if doubt should be raised as to the validity of a statute, such statute should be held valid unless it clearly violates some specific provision of the Constitution. *Texas National Guard Armory Board v. McCraw*, 132 Tex. 613, 126 S.W.2d 627 (1939).

In *Welch v. State*, 148 S.W.2d 876 (Tex. Civ.App.—Dallas 1941, writ ref'd), the court offered the following definition of a municipal corporation:

"As generally understood, the phrase 'municipal corporation' refers to an organized body, consisting of the inhabitants of a designated area—subdivision of the State, created by the legislature, that is, a legal entity possessing certain delegated powers . . .".

■ The municipal power agencies authorized by Section 4a fit this definition. The Act authorizes the formation of agencies which are to be subdivisions of the State consisting of inhabitants of designated areas and possessing certain delegated powers.

In *County of Cameron v. Wilson*, 160 Tex. 25, 326 S.W.2d 162 (1959), the court said:

"The distinction between a proprietary and a governmental function while important in determining tort liability of a city, town or village, is largely beside the point in determining the question now before us."

For many years, the courts of this State have held that facilities used to distribute electric power are used for a public purpose. *Arcola Sugar Mills Company v. Houston Lighting and Power Company*, 153 S.W.2d 628 (Tex.Civ.App.—Galveston 1941, writ ref'd w.o.m.); *A & M Consolidated Independent School District v. City of Bryan*, 143 Tex. 348, 184 S.W.2d 914 (1945).

■ The legislature is authorized to create municipal corporations other than those set out in the Constitution, such as counties, cities or school districts, or which are authorized under special provisions of the Constitution, such as water districts or flood control districts. *Davis v. City of Lubbock*, 160 Tex. 38, 326 S.W.2d 699 (1959).

In the *Davis* case, the court determined that the legislature had the authority to create a public body corporate and politic to be known as an urban renewal agency. The court cited cases upholding the authority to create the Housing Authority of the City of Dallas, the National Guard Armory Board, and the Texas Turnpike Authority. The court then overruled a point urging that the legislature could create only those bodies politic specifically set out in the Constitution or which are authorized to con-

serve natural resources under Section 59 of Article 16 of the Texas Constitution.

 The Texas legislature may make any law not prohibited by the Constitution of the State of Texas or that of the United States of America. The rule is that, in order for the courts to hold an act of the legislature unconstitutional, they must be able to point out the specific provision which inhibits the legislation. If a limitation on the power of the legislature is not expressed, then it must be clearly implied. All intendments are against restrictions upon the legislative power. *Shepherd v. San Jacinto Jr. College Dist.*, 363 S.W.2d 742 (Tex.1962).

The Constitution of Texas adopted in 1876 expressly authorized only the creation of cities and towns, counties and school districts. The legislative power to regulate these three types of political subdivisions was extensively restricted in that Constitution. From the adoption of the Constitution in 1876 until after 1904, the legislature did not create or authorize creation of any different types of municipal corporation. After 1904, various amendments were adopted authorizing the creation of other political subdivisions. These constitutional amendments were submitted to the people by resolutions adopted by the legislature. Appellants assert that this constitutional history constitutes clear legislative recognition that the grants of power in the Constitution to create political subdivisions and municipal corporations also operate as limitations on the power of the legislature to create such municipal corporations. *Parks v. West*, 102 Tex. 11, 111 S.W. 726 (1908).

 The restrictions on the power to levy ad valorem taxes found in the Constitution necessarily limit the power of the legislature to create municipal corporations or political subdivisions to be supported by ad valorem taxation. The situation presented by an agency which is to be vested with the power of local ad valorem taxation and the situation where the Constitution expressly provides for the exercise of a power, and prescribes the manner and method of exercise, are clearly distinct from a case in which an agency is expressly denied the power of ad valorem taxation and where there are no constitutional provisions relating to the creation and operation of said governmental agency. There is no specific provision in the Constitution of Texas which denies to the legislature the power to create a governmental agency and body politic. We find no provision of the Constitution which should be held to impliedly restrict the power of the legislature to create municipal power agencies. *Davis v. City of Lubbock,* supra; *Thomas v. Howard County Hospital Authority,* 489 S.W.2d 403 (Tex.Civ.App.—Eastland), writ ref'd n.r.e. per curiam, 498 S.W.2d 146 (Tex.1973).

Section 4a, Article 1435a does not violate § 64, Art. III, Tex.Const. Section 64 does not limit legislative authority but instead establishes an exception to the general prohibition against special laws found in Article 3, Section 56 of the Constitution. Section 64 authorizes the legislature to provide for the consolidation by special act of governmental offices and functions of government of any one or more political subdivisions comprising or located within any county. It provides that the county government or any political subdivision comprising or located therein may contract with each other for the performance of governmental functions under such terms and conditions as the legislature may prescribe.

The creation of an agency under Section 4a does not cause a consolidation of any governmental offices or functions of office. None of the governmental offices and functions of any of the public entities creating an agency under Section 4a are given up to the agency. The created entity may have the functions which are similar to the functions of the entities creating it, but the result is not consolidation. The result is proliferation of powers or functions of government.

Section 4a is a general law rather than a special law. The legislature has always had the power by the enactment of a general law to consolidate legislatively created governmental offices and functions. Article 3,

Section 64, permits this to be done by special law under limited circumstances. Since Section 4a is a general law; Article 3, Section 64, has no application.

■ The 1975 amendment to Article 1435a, Vernon's Annotated Civil Statutes is not constitutionally infirm by reason of an inadequate title or caption, as asserted by appellants, because the title to the 1975 Act fails to state the subject of the Act, is affirmatively misleading, and is too vague and indefinite.

Where the title to an amendatory bill refers specifically to the prior Act to be amended and the provisions of the amending Act are germane to the amended Act, it has been held that such a title is sufficient. *Schlichting v. Texas State Board of Medical Examiners*, 158 Tex. 279, 310 S.W.2d 557 (1958); *Smith v. Davis*, 426 S.W.2d 827 (Tex.1968).

The title of the 1975 Amendatory Act specifically refers to the prior Act to be amended. Provisions of the 1975 Act are germane to the provisions of Article 1435a, supra. As it existed prior to the 1975 Act it authorized joint action and cooperation between public and private entities to jointly own and operate electric generating facilities as a means of supplying the future energy needs of the State. The amendatory act provides authority for certain public entities to create a joint powers agency to own and operate electric generating facilities as another means of providing for joint and cooperative action to secure future energy needs. The provisions of the 1975 act are different from the provisions of the act which it amended, but they are also relevant, appropriate and closely allied. The subject of the 1975 amendatory act is germane to the subject of the amended act within the definition approved by the Supreme Court in *Schlichting*, supra.

■ No provision of an amendatory statute should be regarded as unconstitutional where it relates, directly or indirectly, to the subject matter of statute to be amended, and is not foreign to the subject expressed in its title. Section 35 of Article

3 of the Constitution is given a liberal rather than a strict construction. *Central Education Agency v. Independent School District of City of El Paso*, 152 Tex. 56, 254 S.W.2d 357 (1953). It is not necessary that the caption of an amendatory bill apprise the reader of the precise effects of the body of the bill, so long as the general subject of the amending bill is disclosed. *Smith v. Davis*, 426 S.W.2d 827 (Tex.1968).

Many decisions in this jurisdiction have sustained the validity of legislation the titles to which, for purposes of brevity, use words such as "certain" or "additional" or "powers and duties" without describing in detail the legislation to follow. *Shannon v. Rogers*, 159 Tex. 29, 314 S.W.2d 810 (1958); *Robinson v. Hill*, 507 S.W.2d 521 (Tex.1974). The Constitution requires that the title of legislative acts give fair notice, not exhaustive detail, of its content. The Amendatory Act of 1975 gives fair notice and the caption of that Act was proper and met the established requirements of law.

Appellants argue that under Article 1435a, supra, a municipal power agency is only authorized to acquire and construct an electric generating plant and related facilities in conjunction with another public entity or private entity as co-owner or co-tenant. Since TMPA is constructing its Gibbons Creek Steam Electric Station alone, appellants contend that it is acting beyond the authority given it in the Act. One of the purposes of Article 1435a was to provide a method of joint action by entities engaged in the generation of electricity to act together as one means of:

"—Achieving economies of scale in providing electric energy to the public and promoting the economic development of the State and its natural resources and to meet the future power needs of the state and its inhabitants."

Article 1435a as originally enacted in 1973, made this possible by allowing public or private entities to join together in construction, ownership, and operation of generating units or transmission lines. The 1975 amendment provided a second way to achieve the same purposes, by allowing pub-

lic entities by joint action to create a municipal power agency to generate and transmit electricity to them, rather than requiring them to join together as co-tenants or co-owners.

The statute authorizes a municipal power agency to sell electricity to the cities which participate in creating it as well as to private entities who might be joint owners with the agency of an electric generating facility. It does not require that the public entities be joint owners with the agency before it can build a power plant. The statute clearly authorizes the agency to own an electric generating unit.

■ The legislature has the authority to delegate its powers to agencies established to carry-out legislative purposes. However, it must establish reasonable standards to guide the entity to which the powers are delegated. The Texas courts have upheld standards which are quite broad. *Southwestern Savings and Loan Association of Houston v. Falkner*, 160 Tex. 417, 331 S.W.2d 917 (1960).

■ Where the legislature delegates its authority, and establishes broad standards, it may leave to selected municipalities the making of rules and the determination of facts to establish the basis for the application of the legislative policy. Such standards may be broad where conditions must be considered which cannot be conveniently investigated by the legislature. *Housing Authority v. Higginbotham*, 135 Tex. 158, 143 S.W.2d 79 (1940).

■ The legislature is not required to set forth in detail all the provisions necessary to govern the agency in the performance of its functions. In the case of municipal power agencies, the legislature has set forth broad standards leaving to the municipalities only the making of the rules by which the legislative policy is to be executed. The record does not reflect a violation of Article 3, Section 52, Texas Constitution. *San Antonio River Authority v. Shepherd*, supra.

By points 13 through 16, appellants assert that Section 4a, Article 1435a, supra, violates the equal protection clause of the Fourteenth Amendment of the United States Constitution. First, appellants argue that Grimes County is an actual part of the area of TMPA. They then point to that provision in Section 4a according the right of a referendum election to the electorate of the creating public entities but denying that right to the voters of Grimes County. Second, they state that the equal protection clause of the Fourteenth Amendment of the United States Constitution has been violated because TMPA was created and was operating without authority of law since it was created by the intervening cities acting under color of state law without providing the voters of Grimes County the right of referendum on the inclusion of land in Grimes County within the actual boundaries of TMPA. Third, it is asserted that there is a violation of the Fourteenth Amendment because the electorate of Grimes County is denied the right to vote for, or otherwise choose, directors of TMPA.

The appellants' arguments under each of these points is based upon the premise that a portion of Grimes County is within the operating area of TMPA as a matter of fact although as permitted by state law the intervening cities elected to include only the area within said cities to be within the boundaries of TMPA. It is undisputed that from the inception of the planning to establish TMPA it was contemplated that certain areas of Grimes County were to be acquired as sources of lignite coal for use in the production of electricity by TMPA. We also assume that the creating cities expected that TMPA would locate its generating plant within the boundaries of Grimes County.

■ There is no constitutional requirement that the boundaries of a political subdivision of this State must include all areas in which the subdivision may have operations. In the absence of a constitutional limitation, it is within the power of the legislature to determine in what areas, either within or without its boundaries, the political subdivision may conduct its operations. *San Jacinto River Conservation and*

*Reclamation District v. Sellers,* 143 Tex. 328, 184 S.W.2d 920 (1945); *Lower Nueces River Water Supply District v. Cartwright,* 274 S.W.2d 199 (Tex.Civ.App.—San Antonio 1954, writ ref'd n.r.e.); *City of New Braunfels v. City of San Antonio,* 212 S.W.2d 817 (Tex.Civ.App.—Austin 1948, writ ref'd n.r. e.).

■ The boundaries of TMPA were determined in the manner set out in a law adopted by the legislature of Texas. The determination of the boundaries of a political subdivision of the state is a "political question" solely within the power, prerogative and discretion of the legislature and not subject to judicial review. *Carter v. Hamlin Hospital District,* 538 S.W.2d 671 (Tex.Civ.App.—Eastland 1976, writ ref'd n.r.e.); *Jimenez v. Hidalgo County Water Improvement District No. 2,* 68 F.R.D. 668 (S.D.Tex., Brownsville Div., 1975), affirmed, 424 U.S. 950, 96 S.Ct. 1423, 47 L.Ed.2d 357 (1976).

Appellants assert that TMPA did not have authority to issue its 1976 Revenue Bonds without holding a bond election, and did not have the authority to spend the proceeds of the 1976 Revenue Bonds for lignite leases. The argument is based upon the contention that the agency is restricted by the procedure for issuing bonds set out in Article 1111 and Article 1112, Vernon's Annotated Civil Statutes. Article 1111 authorizes "All cities and towns including Home Rule Cities operating under this title . . ." to build and purchase and to mortgage and encumber their light systems. Article 1112 restricts the right to sell or mortgage such light systems.

The bonds in question were authorized for the purpose of providing funds with which to discharge costs and expenses of the agency in connection with the acquisition or construction of electric facilities and to provide engineering, planning and financing expenses, as well as for the purpose of paying off revenue bonds previously issued.

■ Section 4a, Article 1435a, supra, provides that a municipal power agency shall have and exercise all of the powers which are by Chapter 10 of Title 128, Revised Civil Statutes of Texas, 1925, as amended, vested in a public entity. Articles 1111 and 1112, supra, are included within Chapter 10 of Title 128. It is undisputed that the revenue bonds issued by TMPA were secured by an irrevocable first lien on and pledge of the net revenues of all funds other than the revenue fund established by the bond resolution. An encumbrance on the revenues of a system is an encumbrance on the system. *City of Dayton v. Allred,* 123 Tex. 60, 68 S.W.2d 172 (1934).

■ TMPA issued its bonds under the authority granted by Article 1435a, supra. By this Article, the agency is authorized to issue revenue bonds without an election. Paragraph (j) of Section 4a of that Article reads:

"(j) The agency shall have the full power to issue revenue bonds or notes, herein sometimes referred to as obligations, from time to time for the accomplishment of its purposes within the interest rate limitations of Chapter 3, Acts of the 61st Legislature, Regular Session, 1969, as amended (Article 717k–2, Vernon's Texas Civil Statutes)."

■ When the legislature makes it possible to issue bonds pursuant to one statute, the issuing governmental agency can follow that statute as the sole source of authority to issue the bonds, without relying on other statutes for such authority. *Atkinson v. City of Dallas,* 353 S.W.2d 275 (Tex.Civ. App.—Dallas 1961, writ ref'd n.r.e.), certiorari denied, 370 U.S. 939, 82 S.Ct. 1587, 8 L.Ed.2d 808, rehearing denied, 371 U.S. 854, 83 S.Ct. 18, 9 L.Ed.2d 92 (1962).

■ In addition, subsection *(l)* of Article 1435a, Section 4a, provides that the agency must submit its bonds to the attorney general for approval, and that after he approves them, they shall be incontestable. The attorney general has approved all of the outstanding bonds of TMPA and, as a result, the bonds are now incontestable for such statutory reasons as the failure to hold a bond election. *Yoakum County Water Control and Improvement District v. First State Bank,* 449 S.W.2d 775 (Tex.1969).

The proceeds derived from the sale of these bonds are available for the purpose of acquiring mineral leases enabling the agency to mine lignite coal for use as fuel. The purpose clause found in the bond resolution authorizes the agency to use the bond proceeds "in connection with the acquisition or construction of certain electric facilities". While the bond resolution does not include a definition of the term "electric facilities" Article 1435a, Section 2(4) defines that term as follows:

> " 'Electric facilities' means any facilities necessary or incidental to the generation of electric power and energy or the transmission thereof, including electric generating units, electric generating plants, electric transmission lines, plant sites, rights-of-way and real and personal property and equipment and rights of every kind in connection therewith."

Lignite leases are useful in connection with electric generating plants. See, *Hicks v. Texas Municipal Power Agency,* 548 S.W.2d 949 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.). The proceeds of bonds authorized for "electric facilities" may be expended to purchase leases for the production of lignite. The purchase of lignite is an essential and vital function of the agency not tinged with illegality, unreasonableness or arbitrariness when considering the overall thrust of the Series 1976 Bond Resolution. *Lewis v. City of Fort Worth,* 126 Tex. 458, 89 S.W.2d 975 (1936).

Appellants urge that each of the intervening cities has surrendered its power to buy electric energy from any and all suppliers and has surrendered certain other statutory powers possessed by the cities. They cite the established principle that a municipal corporation cannot, by contract or otherwise, surrender its statutory or governmental functions or powers and cannot enter into any contract which will control its legislative powers and duties or which amounts to an abdication of statutory functions. *Clear Lake City Water Authority v. Clear Lake Utilities Company,* 549 S.W.2d 385 (Tex.1977); *Bowers v. City of Taylor,*

16 S.W.2d 520 (Tex.Com.App.1929, holding approved).

Appellants assert that inasmuch as TMPA and the four cities are operating without authority of law in the execution and performance of the contractual provisions of the power sales contract in which they surrendered their statutory and governmental powers, the State was entitled to judgment in quo warranto and the trial court erred in granting the summary judgments.

In *City of Big Spring v. Board of Control,* 404 S.W.2d 810 (Tex.1966), the court determined that the City of Big Spring had the authority to make a contract with the State of Texas to furnish water to the Big Spring Hospital in the exercise of a proprietary or business function. The court stated:

> "In such capacity a city can make a contract, under authority of legislative enactment, in all things as an individual or private corporation."

The court in *State ex rel. Phillips v. Trent Independent School District,* 141 S.W.2d 438 (Tex.Civ.App.—Eastland 1940, writ ref'd), determined that an information in the nature of quo warranto was not available to review or control the official decision of trustees of an independent school district to abandon an elementary school on the ground that the need for such a school no longer existed. In the course of the opinion, the court stated:

> "Quo warranto (information in the nature of) is not an action available to review or control such official decision. The right of an officer to exercise certain functions as a part of the duties of his office will not be determined on a proceeding by quo warranto. *State v. Smith,* 55 Tex. 447."

In the case cited, the court quoted this language from High on Extraordinary Remedies:

> "That the court will not permit its use [quo warranto] for the purpose of preventing a public officer from exercising any right or privilege incident to his office, and it cannot be used to restrain an officer from doing a particular act, the

*right to perform which is claimed as a part of his official functions."*

The court then said:

"The proceeding [quo warranto] against an officer—may not be extended to relief against official misconduct which does not work a forfeiture." (Citations omitted)

"In brief, as applied to a school district it is only when official action is sought to be challenged on the ground of some invalidity in the district that the action of quo warranto is available."

The court in *State v. Trent Independent School District,* supra, also considered the question of whether the relators in the action had shown any right to the judgment sought in their individual capacity and found no justiciable interest.

Article 6253, Vernon's Annotated Civil Statutes, defines the scope of the action of quo warranto in this State. It provides:

"If any person shall usurp, intrude into or unlawfully hold or execute, or is now intruded into, or now *unlawfully holds* or executes, any office or franchise, or any office in any corporation created by the authority of this State, or any public officer shall have done or suffered any act which by law works a forfeiture of his office, or any association of persons shall act *within this State as a corporation* without being legally incorporated, or any corporation does or omits any act which amounts to a surrender or a forfeiture of its rights and privileges as such, or exercises power not conferred by law—the Attorney General, or district or county attorney of the proper county or district, either of his own accord or at the instance of any individual relator, may present a petition to the district court of the proper county or any judge thereof in vacation, for leave to file an information in the nature of a quo warranto in the name of the State of Texas. If such court or judge is satisfied that there is probable ground for the proceeding, he shall grant such leave and order the information to be filed and process to issue."

Quo warranto tests only whether the public corporation has the power assumed, not whether it was properly exercised. An information in the nature of a quo warranto will not lie to test the validity of a public corporation's contract which is a mere incident to the execution of a power conferred on it. *State ex rel. Johnson v. Consumers Public Power District,* 143 Neb. 753, 10 N.W.2d 784, 152 A.L.R. 480 (1943). The Nebraska Supreme Court stated that quo warranto cannot be used for the enforcement or forfeiture of a municipal contract. The violation of such a contract must be redressed, as all ordinary wrongs are redressed, by the usual remedies.

"Quo warranto is addressed to preventing a continued exercise of authority unlawfully asserted, not to a correction of what already has been done under it or to a vindication of private rights." *Johnson v. Manhattan R. Co.,* 289 U.S. 479, 53 S.Ct. 721, 77 L.Ed. 1331 (1933).

There is nothing in the Texas statute authorizing this remedy to attack certain provisions of a contract entered into by a municipal corporation in the exercise of lawful authority.

It appears from the State's first amended original information in the nature of a quo warranto that the relators are all residents of Grimes County, Texas, with the exception of one resident of Madison County, Texas. It clearly appears that none of the relators live within the boundary of the power agency or of the cities with which it has contracted. There are no allegations in the petition which would indicate that the relators have any justiciable interest in a suit to enforce or defeat the contract between TMPA and the four intervening cities. Appellants' 18th point of error cannot be sustained.

By points 19 and 20, appellants complain of the action of the trial court in overruling appellants' exceptions to certain summary judgment affidavits. These affidavits are in proper form, and we find no ground that would require the trial court to strike them from the record. Where evi-

dence is improperly admitted in a trial to the court, as a rule the trial court will be presumed to have disregarded such inadmissible evidence. *Victory v. State,* 138 Tex. 285, 158 S.W.2d 760 (1942). An analogous situation is presented here. If the affidavits contain certain statements which have no probative value, we will presume that the trial court disregarded these statements. Reversible error is not presented by these points.

After TMPA had answered appellants' original information in the nature of a quo warranto, an amended information was filed. TMPA thereafter filed an instrument denominated a supplemental answer specifically pleading certain validating acts. Appellants assert that the trial court erred in failing to strike this supplemental answer and alternatively to correctly entitle such pleading as defendants' first amended original answer.

Rule 98, Texas Rules of Civil Procedure, provides:

"The defendant's supplemental answers may contain special exceptions, general denial, and the allegations of new matter not before alleged by him, in reply to that which has been alleged by the plaintiff."

■ A supplemental answer is properly filed in response to any pleading of the plaintiff, regardless of whether it is an amended petition or a supplemental petition. The trial court did not err in refusing to strike the pleading or to consider it as the defendant's first amended original answer.

The points of error presented by appellants have been carefully briefed and contain many different arguments in support of each point, as well as authorities thought to be controlling on each point. Appellants' brief and the briefs filed by appellee are thorough and lengthy. The various arguments and authorities found in these briefs have been considered by this court although many of the arguments have not been specifically referred to in the opinion. The authorities cited are too numerous for individual discussion. The counterpoints presented by the appellee have not been considered.

The judgment of the trial court is affirmed.