

# THE ATTORNEY GENERAL
## OF TEXAS

JIM MATTOX
ATTORNEY GENERAL

December 11, 1990

Honorable O. H. "Ike" Harris
Chairman
Economic Development Committee
Texas State Senate
P. O. Box 12068
Austin, Texas    78711-2068

Opinion No.  JM-1255

Re:  Use of municipal rev-
enue bonds  to  acquire  a
school building for  lease
to an  independent  school
district    (RQ-1876)

Dear Senator Harris:

You ask whether two proposed transactions involving the
issuance of revenue bonds by  a municipality to finance  the
acquisition of a  school building or  facility to be  leased
to an independent  school  district solely  for  educational
purposes "would violate Article  III or any other  provision
of the Texas  Constitution." Given the  strict division  of
governmental  powers  between  municipalities  and  school
districts that the Texas courts have derived from the  state
constitutional provisions  concerning municipal  and  school
finance, we must conclude  that these proposed  transactions
violate the Texas  Constitution. See generally Tex.  Const.
arts. VII, XI.

You describe one  of the two  proposed transactions  as
follows:

> [The]  transaction would  involve  a  pur-
> chase of  land  by a  municipality,  and  the
> construction of a school building or facility
> on such land, all with proceeds from the sale
> of revenue bonds, and the lease of such  land
> and building or facility to a district.   The
> lease would be  for a maximum  term of  years
> extending at least to  the final maturity  of
> the bonds,  and probably  to the  end of  the
> expected  useful  life  of  the  building  or
> facility.  The lease rentals would be payable
> from the district's annual maintenance taxes,
> on  a  year-to-year  basis,  with  an  annual
> option to  renew by  annual appropriation  of
> lease  rental.   There  would  be  no  legal
> obligation on  the part  of the  district  to
> make any future payment, and the lease  would
> be renewed annually only at the option of the

> district . . . . The annual lease rental for each fiscal year would be at least sufficient to pay the principal and interest on the bonds during such fiscal year, and the district would be required to operate and maintain the building or facility and pay the expense thereof during such fiscal year. If the district failed to exercise its annual option and renew the lease, it would be required to vacate . . . but the district would not be liable for any further payments.

The brief included with your request explains that the school district assisted by the municipality would be located within the municipality's boundaries. No mention is made in the brief of any municipal use of the building or facility during the period leased to the district or to concurrent arrangements with other lessees that would generate additional funds that could be used for municipal purposes. In fact, the brief states that the building or facility will be leased solely for educational purposes and makes no mention at all of any expected profit on the transaction.

The second transaction you propose involves "terms and conditions similar" to the first transaction except that the municipality in the second would lease land then owned by the district upon which to construct the school building or facility. After construction is complete, the municipality would "lease-back" the land and the new building or facility to the school district solely for educational purposes. Annual lease payments to be paid by the school district "would be sufficient to amortize the bonds and provide to the municipality its annual land rental to the district." If the school district does not exercise its annual option to renew the lease, the municipality would not be obligated to make future lease payments. In addition, the brief explains that it

> is probable that the [lease-back] transaction would be structured so that at least one or two years of municipality land rentals would be escrowed from bond proceeds to pay such rentals. This would result in forcing the district to vacate the school building or facility for at least a year or two if it failed to exercise its annual option to renew the building lease-back.

In Attorney General Opinion JM-1194 (1990), we noted that the Texas Constitution is replete with provisions

limiting the use of governmental resources and powers for public purposes. Id. at 2 (referring to Tex. Const. art. III, §§ 50, 51, 52(a); art. VIII, § 3; art. XI, § 3; art. XVI, § 6); see also Tex. Const. art. III, § 52-a (describing economic development and diversification and the elimination of unemployment as public purposes). Transactions permissible under these provisions must provide "for the direct accomplishment of a legitimate public purpose." Brazoria County v. Perry, 537 S.W.2d 89, 91 (Tex. Civ. App. - Houston [1st Dist.] 1976, no writ); see also Davis v. City of Taylor, 67 S.W.2d 1033, 1034 (Tex. 1934) (the object to be achieved must be directly connected to the local government). Furthermore, the accomplishment of the public purpose must be secured by placing sufficient controls on a transaction "to insure that the public purpose will be carried out." Attorney General Opinion JM-1229 (1990) at 6.

The limitation that public resources and powers be used for public purposes restricts the legislature as well as political subdivisions. Attorney General Opinion JM-1194 at 2; see also 1 G. Braden, The Constitution of the State of Texas: An Annotated and Comparative Analysis 257-58 (1977). Political subdivisions, however, may assist each other, but only if the resources and powers donated by one political subdivision to another are used for a definite public purpose of the donating subdivision. State ex rel. Grimes County Taxpayers Ass'n v. Texas Mun. Power Agency, 565 S.W.2d 258, 265 (Tex. Civ. App. - Houston [1st Dist.] 1978, writ dism'd w.o.j.) (purpose for transfer must be within powers of governmental entity transferring the resources); Willatt, Constitutional Restrictions on Use of Public Money and Public Credit, 38 Tex. B. J. 413, 421 (1975). Thus, municipal resources and powers, including municipal bond powers, must be used to accomplish municipal purposes. See Braden, supra; 2 E. McQuillen, The Law on Municipal Corporations § 10.31, at 818-19 (3d ed. 1979) (all of a municipality's powers, property and offices constitute a public trust and must be used for lawful municipal purposes).

The initial determination whether a particular use of a municipal resource or power satisfies the public purpose requirement is within the sound discretion of the municipality's governing body. See, e.g., Davis v. City of Taylor, supra, at 1034; Dodson v. Marshall, 118 S.W.2d 621 (Tex. Civ. App. - Waco 1938, writ dism'd w.o.j.). The exercise of this discretion, however, is subject to judicial review, and "in its final analysis, it is for the courts to answer" whether the constitutional requirement is satisfied. 15 McQuillen, supra, § 39.19, at 39 (3d ed. 1985).

The Texas courts have addressed the division of powers between municipalities and school districts, and absent further judicial guidance, we are constrained to find the proposed transactions in violation of the Texas Constitution. In City of Rockdale v. Cureton, 229 S.W. 852 (Tex. 1921), the Texas Supreme Court refused to apply the constitutional limitations on municipal taxation to prohibit the issuance of bonds by the city of Rockdale for the purpose of constructing public school buildings. The city of Rockdale had previously taken over the control of the public schools within its boundaries and had thereby constituted itself a municipal school district in accordance with section 3 of article VII of the Texas Constitution.[1]

---

1.  Section 3 of article VII of the 1876 Texas Constitution severely restricted state taxation for school purposes. Section 3 as well as section 1 of article VII, which mandates the creation of an efficient system of public schools, were thoroughly and bitterly debated during the Convention of 1875. See Shepherd v. San Jacinto Junior College Dist., 363 S.W.2d 742 (Tex. 1962) (summarizes history of the provisions and the debate at the convention); Braden, supra, at 505-06, 511-12. Much of the debate centered on the ability of Texas to bear the costs of increased taxation after the Civil War and whether the benefits of free public schools supported by public taxation would offset the costs. S. McKay, Debates in the Texas Constitutional Convention of 1875 100-13, 194-201, 212-34 (1930); Shepherd, supra, at 747-48 n.3. In 1883, section 3 was amended to increase state taxation for school purposes and to authorize the legislature to create school districts. Section 10 of article XI, which had been part of the constitution since 1876, already authorized the legislature to constitute any city or town a separate and independent school district.

The 1883 amendment to section 3 also permitted the legislature to authorize districts that it created to levy property taxes not to exceed 20 cents on the $100. Subsequent amendments raised this maximum first to 50 cents and later to $1.00 on the $100. The 1883 amendment carefully excepted from the district tax limitation incorporated cities and towns constituting separate and independent school districts. This exception was consistent with section 10 of article XI of the 1876 Constitution, which permited municipalities constituting separate and independent school districts to levy any tax in agreement with

(Footnote Continued)

At the time of the bond issue considered in _City of Rockdale v. Cureton_, section 3 of article VII authorized the legislature to create school districts. The section also imposed a maximum on the rate of ad valorem taxation by such school districts, but excepted from the maximum "incorporated cities or towns, constituting separate and independent school districts." The supreme court referred to this exception and held inapplicable the constitutional limitations on municipal taxation. Relying on the separate constitutional provisions for municipal and school finance, the supreme court stated that a municipality

> taking over the control of its public schools shall constitute such a [school] district. There may thus be conferred upon a city a dual character, and with such character, dual powers. There could have been no purpose in authorizing the creation of towns and cities as independent school districts -- a recognized separate class of municipal corporations with individual powers, unless in that capacity they were to have the powers of such districts.
>
> The City of Rockdale had lawfully acquired this dual character. It had its powers _as strictly a municipality, to be exercised for strictly municipal purposes; and it had its powers as a duly constituted independent school district. The two are not to be confused_.

229 S.W. at 852-53 (emphasis added); _see also_ Attorney General Opinion O-7060 (1946) (recognizing the dual nature of cities constituting independent school districts and that article VII governs and limits school powers, while article XI governs municipal powers).[2]

_____

(Footnote Continued)
their charters. In 1920, section 3 was amended to except all independent and common school districts from the constitutional restriction on taxation. Section 10 of article XI was repealed in 1969 as obsolete, but as early as 1901, the Texas Supreme Court recognized that the 1883 amendment to section 3 of article VII had superseded that section. _State v. Brownson_, 61 S.W. 114 (Tex. 1901).

2. _But see City of Athens v. Moody_, 280 S.W. 514 (Tex.
(Footnote Continued)

The reasoning in City of Rockdale v. Cureton has been extended beyond the area of taxation.  In City of El Paso v. Carroll, 108 S.W.2d 251, 257 (Tex. Civ. App. - El Paso 1937, writ ref'd), the court summarized Rockdale and related decisions before concluding that these "decisions seem to us to be conclusive of the lack of power in the city council to aid in financing the support and maintenance of the schools."  The city of El Paso, like the city of Rockdale, had assumed control of its public schools.  The court held that the city of El Paso, even though it was a home rule city, could not lend $54,000 from surplus revenues generated by its water works system to the school district until the district was able to collect certain delinquent taxes.  108 S.W.2d at 259.  In the court's view, "the rigid constitutional property tax structure would be violated if local governments were permitted to shift funds among themselves."  Braden, supra, at 258 (discussing City of El Paso v. Carroll).

The holding in the El Paso case was affirmed ten years later in San Antonio Indep. School Dist. v. Board of Trustees of San Antonio Elec. & Gas Sys., 204 S.W.2d 22 (Tex. Civ. App. - El Paso 1947, writ ref'd n.r.e.).  The city of San Antonio had proposed paying the school district approximately $114,000 a year for 30 years from certain city utility revenues as reimbursement for district taxes that would have been imposed if the city had not purchased the local electric and gas utility.  Citing to City of El Paso v. Carroll, the court held that the city could not donate public funds to the school district since such a transaction would violate sections 51 and 52 of article III of the Texas Constitution, which prohibit the grant of public funds. Underlying this holding is the recognition that a municipality lacks power to aid in the financing of public schools as stated in City of El Paso v. Carroll, since if such assistance were a public purpose of a municipality, the proposed annual donation of city funds to the school district to replace lost tax revenue would not have violated sections 51 and 52 of article III.  Braden, supra, at 232-35 (and authorities cited therein explaining the public purpose

---

(Footnote Continued)
1926) (considering outstanding school building indebtedness of a city, which was constituted as a separate school district, as a reduction in total indebtedness that could be incurred for municipal purposes given limits on municipal taxation).  Compare Attorney General Opinion O-6059 (1944) (distinguishing City of Athens on statutory grounds).

exception to the constitutional prohibitions against the loan or grant of public resources).

The three cases discussed above and the related decisions summarized in City of El Paso v. Carroll all focus on the dual and separate nature of municipalities and school districts.[3]  This focus may be attributable in part to an approach to constitutional construction that gives greater weight to implied limitations than a court today would accord.  See, e.g., Shepherd v. San Jacinto Junior College Dist., 363 S.W.2d 742, 743 (Tex. 1962) (upholding legislation authorizing junior college district taxation and stating that legislative acts are not unconstitutional absent express constitutional prohibition or clear implication that they are unconstitutional).  Compare Parks v. West, 111 S.W. 726, 727 (Tex. 1908) (noting the many limitations in article VII and holding unconstitutional school districts created to cross county lines).  Nevertheless, we have no indication in any opinion that the courts would reject today the reasoning concerning the separation of municipal and school powers or the results in City of Rockdale v. Cureton and in City of El Paso v. Carroll and the related decisions.  Thus, we must conclude that municipal powers and purposes do not include those reserved to school districts for the provision and maintenance of schools, including the power to finance and construct school buildings or facilities.[4]

The brief accompanying your request refers to section 52-a of article III of the Texas Constitution as support for the proposed transactions.  Section 52-a was adopted by the

---

3.  See also Attorney General Opinions O-7060 (1946); O-6059 (1944) (for citations to other related cases).

4.  Chapter 20 of the Education Code covers the tax and revenue bond powers given by the legislature to school districts for building construction and other purposes. Sections 20.22, 20.51(g), 20.922, and 20.925 authorize the use of revenue bonds subject to certain restrictions.  In general, these provisions authorize school districts to issue revenue bonds to acquire athletic and recreational facilities or to pledge the proceeds from the sale of surplus realty owned by the district for the purpose of retiring revenue bonds issued by the district for the construction of school facilities. Other sections of the chapter authorize the issuance of bonds secured by ad valorem taxes. See, e.g., Educ. Code §§ 20.01, 20.04.

voters in 1987. Section 52-a expands the definition of public purposes to include economic development and diversification, elimination of unemployment and underemployment, stimulation and growth of agriculture, and expansion of state transportation and commerce.

As we stated in Attorney General Opinion JM-1227 (1990), section 52-a does create "exceptions to the preexisting constitutional prohibitions on the lending of public credit." Id. at 3. Pertinent commentary preceding adoption of section 52-a by the voters, however, makes clear that it was intended to authorize the legislature to enact laws that created governmental programs furthering economic growth or that authorized governmental loans or grants of public funds to assist private businesses. See House Research Organization's Special Legislative Report, 1987 Constitutional Amendments and Referendum Propositions, August 17, 1987 (new section will permit the state and local governments to assist individual private enterprises); Texas Legislative Council Information Report No. 87-2, Analyses of Proposed Constitutional Amendments and Referenda Appearing on the November 3, 1987 Ballot, September 1987 (section will overcome constitutional prohibition against use of public resources to obtain general benefits obtainable from assisting private industry).

No language in section 52-a or in the commentary preceding its adoption suggests that the section was intended to overcome any constitutional prohibition against municipalities assisting school districts to acquire school facilities through the use of municipal powers. In fact, the commentary states that those against adoption of the new section argued that the proper role of government was the financing of public educational facilities and other infrastructure improvements such as highways and airports, and not the provision of public funds to private businesses. House Research Organization's Special Report, supra, at 17 (government should let individual businesses assume the risks and rewards of the free market and instead support public schools and needed transportation improvements); Texas Legislative Council Information Report, supra, at 15 (given shortage of public funds, such funds should be used for the support of essential government functions and not the support of private enterprises).

Furthermore, there is no language in either section 52-a or in the relevant commentary to suggest that the amendment was intended to change the requirements that public resources and powers be used for "the direct accomplishment of a public purpose" and that transactions using such resources and powers contain sufficient controls "to

insure that the  public purpose be  carried out."   Attorney
General Opinion JM-1229 (1990) at 5-6 (and authorities cited
therein); see also Davis v.  City of Taylor, 67 S.W.2d  at
1034 (the object to be  achieved must be directly  connected
to the local  government).  It merely  adds to the  purposes
for which the legislature may authorize the loan or grant of
public funds.

Consequently, we are unable  to accept the  proposition
that a municipality entering into the proposed  transactions
would  satisfy  the   public  purpose  requirement  because
decreases in unemployment and increases in business activity
would  result  from  the  availability  of  expanded  school
facilities.  Although those changes are within the  expanded
public purposes as described  in section 52-a, article  III,
such changes in unemployment  and business activity are  not
the direct goal of the proposed transactions as described to
us.  At best, those changes are only incidental benefits  to
be obtained, if  at all, indirectly,  and in the  indefinite
future.[5]   Furthermore,   the   proposed   transactions   as
described to us do not contain sufficient controls to insure
that such changes will take place as planned.

Thus, we must conclude  that the proposed  transactions
violate the strict division  of governmental powers  between
municipalities and school  districts that  the Texas  courts
have derived from the  provisions of the Texas  Constitution
governing municipal  and school  finance.  In  addition,  we
find no support in section 52-a, article III, for  rejecting

---

5.  According to the  description of  the first  trans-
action provided  us,  the  lease would  be  renewable  on  a
year-to-year basis solely at  the district's option and  the
annual lease rental paid by  the district would be at  least
sufficient to pay  the principal and  interest on the  bonds
due each  year.  The  second  transaction  is  described  as
similar except that annual  school lease rentals would  also
cover the  municipality's annual  land rentals  and  perhaps
would be  structured to  force the  district to  vacate  the
building for a  year or  two if  it failed  to exercise  its
renewal  option.  These  terms  do  not  appear  to  impose
controls to assure achievment of a direct municipal purpose.
Nor do  they suggest  that significant  funds in  excess  of
those needed  to  retire the  bonds  will be  generated  and
applied to achieve a  municipal purpose.  Finally,  probable
availability of the lease  for a year or  two in the  future
for an unstated and uncertain municipal use cannot meet  the
public purpose requirement.

the reasoning or the results of the Texas cases establishing this strict division of powers; nor are we able to discern any direct municipal purpose to be accomplished in the proposed transactions as described to us.

### S U M M A R Y

Two proposed transactions involving the use of municipal revenue bond powers to assist a school district to acquire a school building violate the strict division of governmental powers between municipalities and school districts that the Texas courts have derived from the state constitutional provisions governing municipal and school finance. In addition, there is no support in section 52-a, article III, for rejecting the reasoning or the results of the Texas cases establishing this strict division of powers; nor is there any discernible direct municipal purpose to be accomplished in the proposed transactions.

Very truly yours

J I M   M A T T O X
Attorney General of Texas

MARY KELLER
First Assistant Attorney General

LOU MCCREARY
Executive Assistant Attorney General

JUDGE ZOLLIE STEAKLEY
Special Assistant Attorney General

RENEA HICKS
Special Assistant Attorney General

RICK GILPIN
Chairman, Opinion Committee

Prepared by Celeste A. Baker
Assistant Attorney General