The **RAILROAD COMMISSION OF TEXAS** and Dan Morales, Attorney General, Petitioners,

v.

**LONE STAR GAS COMPANY, A DIVISION OF ENSERCH CORPORATION,** and Enserch Gas Company, Respondents.

No. D–0650.

Supreme Court of Texas.

Dec. 31, 1992.

Dan Morales, Sarah F. Miller, Ed Salazar, Don Walker, Austin, for petitioners.

David C. Duggins, Barry Bishop, James E. Mann, Austin, for respondents.

## OPINION ON MOTION FOR REHEARING

HIGHTOWER, Justice.

Petitioners and Respondents' motions for rehearing are overruled. The opinion of September 23, 1992 is withdrawn and the following is substituted.

Lone Star Gas Company, a division of Enserch Corporation (Lone Star), and Enserch Gas Company (Enserch), a wholly owned subsidiary of Enserch Corporation, challenge Texas Railroad Commission (Commission) Rules 30(a)(1) and (5), and 34(h)(2–4) (hereinafter Rules) governing the natural gas industry. Lone Star and Enserch sued the Commission and the Attorney General of Texas seeking a declaration of the invalidity and applicability of the Rules. After a hearing, the trial court rendered judgment that the Rules were valid but dismissed Lone Star and Enserch's request for declaratory relief on other grounds. The court of appeals reversed the trial court's judgment and rendered judgment that the Rules are invalid because the Rules are preempted by federal law. 798 S.W.2d 888. For the reasons explained herein, we reverse the judgment of the court of appeals and render judgment that the Rules are valid.

The issues before this court are (1) whether the Commission had the statutory authority to promulgate the Rules, (2) whether the Rules are consistent with the statutory authority relied upon by the Commission, (3) whether the statutory authority to promulgate the Rules contains sufficient guidelines or standards for the exercise of such authority, (4) whether the Rules disregard the separate corporate existence of Lone Star and Enserch without notice, hearing or evidence and (5) whether the Rules are preempted by federal law.

▌▌ Lone Star and Enserch challenge Rules 30(a)(1) and (5), and 34(h)(2–4). *See* Tex.R.R. Comm'n, 12 Tex.Reg. 536 (1987) (codified at 16 Tex.Admin.Code § 3.30(a)(1) and (5) and 3.34(h)(2–4) (since amended)).[1]

---

1. Rule 30(a)(1) defines a "first purchaser" as: The first purchaser of natural gas produced from a well. A first purchaser and any affiliate of the purchaser that transports any natural gas it purchases from a well by use of the same pipeline system used by the first purchaser of which it is an affiliate shall be treated as a single first purchaser for purposes of nominations and ratability requirements; provided, however, that an affiliate that is nominating or purchasing and accepting deliveries pursuant to a special marketing program that is in compliance with § 3.34(h) of this title (relating to Gas to be produced and Purchased Ratably), shall be treated as a separate first purchaser; and, provided further that the designation of such affiliate as a separate first purchaser is reviewable by the commission and may be disallowed upon a showing that the designation was for purposes of circumventing this section and § 3.34 (relating to Gas to be produced and Purchased Ratably). Any affiliate may file forms in its own name.

Rule 30(a)(5) defines an "affiliate" as: A person or entity that owns, is owned by, or is under common ownership with another person or entity to the extent of 50% or more or that otherwise controls or is controlled by another person or entity. Affiliates of a common entity are also affiliates of each other. For purposes of this section and §§ 3.28, 3.31, and 3.34 of this title (relating to Potential and Deliverability of Gas Wells to be Ascertained and Reported; Gas Well Allowables; and Gas to be Produced and Purchased Ratably)

The Commission's purpose in promulgating the Rules was, among other things, to prevent discriminatory production and taking of natural gas, prevent waste, promote conservation, protect correlative rights,[2] and protect the priority system concerning

(Statewide Rules 28, 31, and 34): a person or entity that purchases gas solely for purposes other than resale shall not be considered an affiliate, and an interstate pipeline, as defined in § 2(15) of the Natural Gas Policy Act of 1978 (15 U.S.C. § 3301 et seq.), shall not be considered an affiliate of an intrastate pipeline.

Rule 34(h) provides in pertinent part:

(h) If a first purchaser elects to qualify an affiliate as a separate first purchaser in § 3.30(a)(1) of this title (relating to Gas Nominations required) (Statewide Rule 30), the first purchaser may designate the affiliate as a special marketing program. The special marketing program must comply with the following with respect to the nomination, purchase, and acceptance of delivery of natural gas.

(1) For purposes of this subsection, an affiliated first purchaser is the special marketing program purchaser's affiliate whose pipeline is being used to transport the gas in the special marketing program.

(2) Each and every special marketing program offer to purchase gas must be made without discrimination within a field and without unjust or unreasonable discrimination between fields to all operators for all wells on the pipeline system of the affiliated first purchaser from which the affiliated first purchaser has been purchasing and accepting delivery of gas as a first purchaser. The offer must also be made for all first, second, and third priority category gas on the affiliated first purchaser's pipeline system which it has been purchasing and accepting for delivery under an obligation to purchase and accept delivery from the tailgate of a plant processing gas to extract liquids, or from a gathering system that purchases from wells and is required by contract or by its physical connections to sell its gas entirely to the affiliated first purchaser, whether or not those purchases were made as a first purchaser.

(3) It is unreasonably discriminatory, and therefore prohibited, for the offer to purchase gas in the special marketing program, or for any release of gas for sale in the special marketing program to require release of any claims under any existing contract other than a release of the gas for sale in the special marketing program or a requirement of a volume-for-volume basis for gas taken in the special marketing program to be credited against any existing contract, if the credit provision is limited to the period of actual participation in the special marketing program. Nothing in this paragraph shall prohibit an operator of any well from offering terms inconsistent with these provisions. The making of an offer which is not accepted shall not affect rights under existing contract.

(4) If a well producing priority category 1, 2, or 3 gas is shut in or curtailed, and waste is found by the commission to exist, neither a special marketing program purchaser nor its affiliated first purchaser may purchase lower priority gas until all the priority 1, 2, and 3 gas is taken and resulting waste is prevented. The commission shall expedite determination of waste, and may enter an emergency, temporary, or interim order upon affidavit proof that waste is occurring.

Rule 34(h)(3) and (4) has been amended but such amendments are unrelated to the issues before this court. Rule 34(h)(3) was amended effective February 29, 1988. Tex.R.R. Comm'n, 13 Tex.Reg. 838 (1988) (codified at 16 Tex.Admin.Code § 3.34(h)(3)). Rule 34(h)(4) was amended effective September 8, 1987. Tex. R.R.Comm'n, 12 Tex.Reg. 2860 (1987) (codified at 16 Tex.Admin.Code § 3.34(h)(4)).

2. "Correlative rights guarantee a mineral interest owner an opportunity to produce a 'fair share' of the reserves underlying his land." *Texaco Producing, Inc. v. Fortson Oil Co.*, 798 S.W.2d 622, 624 (Tex.App.—Austin 1990, no writ). "There appear to be two aspects of the doctrine of correlative rights: (1) as a corollary of the rule of capture, each person has a right to produce oil from his land and capture such oil or gas as may be produced from his well, and (2) a right of the land owner to be protected against damage to a common source of supply and a right to a fair and equitable share of the source of supply." 8 H. Williams & C. Meyers, *Oil and Gas Law: Manual of Oil and Gas Terms* 257 (1991). Although "a landowner is entitled to an opportunity to produce his fair share of oil from a common reservoir, this rule is qualified by both the rule of capture and the Commission's authority to prevent waste." *Texaco, Inc. v. Railroad Comm'n*, 583 S.W.2d 307, 310 (Tex.1979). Correlative rights are also affected by the Mineral Interest Pooling Act, Tex.Nat. Res.Code §§ 102.001–102.112. Section 102.011 provides that under certain circumstances, "the commission, on the application of an owner … and for the purpose of avoiding the drilling of unnecessary wells, protecting correlative rights, or preventing waste, shall establish a unit and pool all of the interests in the unit within an area containing the approximate acreage of the proration unit…." Section 102.017 provides that "all orders effecting the pooling shall be made on terms and conditions that are fair and reasonable and will afford the owner or owners of each tract or interest in the unit the opportunity to produce or receive his fair share." *See also Railroad Comm'n v. Pend Oreille Oil & Gas*, 817 S.W.2d 36, 43–47 (Tex.1991).

nominations, purchases and production of gas. *See* Tex.R.R. Comm'n, 12 TEX.REG. 536, 536–37 (1987).

The Commission promulgated these Rules in response to the creation of affiliated companies (generally known as special marketing programs or SMPs) by pipeline companies. SMPs coordinate their activities with their affiliated pipeline company to buy or broker gas and often transport gas on their affiliate's pipeline. SMPs evolved in the gas marketing industry as a result of a natural gas surplus which resulted in low natural gas prices. Gas companies such as Lone Star bound by long-term contracts to buy higher priced gas began losing their market share because customers were unwilling to pay the higher cost of gas. These customers began purchasing the cheaper gas from the spot market.[3] As a result, SMPs were formed for the purpose of buying and selling cheaper gas in the spot market. Because of its price of gas, Lone Star is able to sell only twenty-five percent of its available gas. Enserch Corporation formed Enserch for the purpose of selling the cheaper spot market gas to Lone Star customers who purchased less gas from Lone Star due to Lone Star's higher price. Enserch purchased gas from producers who had been released from long-term purchase contracts with Lone Star and also from producers unrelated to Lone Star. The Commission in part promulgated the Rules because it believed that pipeline companies, often the only available means of transporting gas from the producer to the market, could exercise too much market leverage in negotiating with producers for the release of gas for sale in the spot market. The Rules

treat pipeline companies and their SMPs as one entity for purposes of preventing discriminatory production and taking of natural gas if the SMP transports gas on its affiliate's pipeline system unless the SMP otherwise qualifies as a first purchaser under Rule 34(h) or applies for a hardship exemption under Rule 34(k). 16 Tex.Admin.Code §§ 3.30(a)(1) and (5), 3.34(h) and (k).[4] The Rules define the conditions under which pipeline companies may qualify their marketing affiliates as SMPs subject to separate Commission regulation. The Rules require the SMPs' marketing activities to be non-discriminatory and define specific conduct constituting impermissible discrimination. 16 Tex.Admin.Code § 3.34(h)(2) and (3).

The Rules also constitute a portion of a priority system concerning nominations, purchases and production of gas. *See* 16 Tex.Admin.Code §§ 3.30(g), 3.34(a). The purpose of the priority system is to guarantee the continued production of casinghead gas,[5] oil and special allowable wells and "to prevent waste, to promote conservation, and to encourage production of natural gas supplies." Tex.R.R. Comm'n, 12 TEX. REG. 536, 536 (1987) (preamble). The "priority system" generally provides that higher priority gas (usually casinghead gas and special allowable wells) should be fully produced before lower priority gas is produced. The Commission in part promulgated the Rules based upon the belief that a pipeline company which was unable to take lower priority gas due to low market demand could circumvent the priority system by creating a SMP to buy and sell the lower priority surplus gas. In effect, a

---

**3.** There are two separate and distinct gas markets. The short-term or spot market is price sensitive and satisfies the needs of large sophisticated customers who buy gas on the basis of price while the long-term market is characterized by stable end-use purchasers requiring a continuous long-term supply of gas and having long-term purchase contracts.

**4.** Rule 34(k) provides:
If the operation of this section or §§ 3.28, 3.30, or 3.31 of this title (relating to Potential and Deliverability of Gas Wells to be Ascertained and Reported; Gas Nominations; and Gas Well Allowables) (Statewide Rules 28, 30

and 31) causes undue hardship, the commission may, after proper notice and hearing, grant an exception or take appropriate action, including action to prevent waste or protect correlative rights.

**5.** "Casinghead gas" is generally defined as "[g]as produced with oil in oil wells, the gas being taken from the well through the casinghead at the top of the well, as distinguished from gas produced from a gas well." 8 H. Williams & C. Meyers, *Oil and Gas Law: Manual of Oil and Gas Terms* 156 (1991).

pipeline company could be curtailing casinghead gas (and the attendant oil production) on its system while its SMP was purchasing one hundred percent of the lower priority gas on the same pipeline system. The Rules treat pipeline companies and their SMPs as one entity for purposes of nominating and taking gas unless the SMP otherwise qualifies as a first purchaser under Rule 34(h) or applies for a hardship exemption under Rule 34(k).

## I.

The Commission argues that it had the statutory authority to promulgate the Rules. We agree.

■ "[A]n agency can adopt only such rules as are authorized by and consistent with its statutory authority." *State Board of Insurance v. Deffebach*, 631 S.W.2d 794, 798 (Tex.App.—Austin 1982, writ ref'd n.r.e.). An agency's authority to promulgate rules and regulations "may be expressly conferred on it by statute or implied from other powers and duties given or imposed by statute." *Dallas County Bail Bond Bd. v. Stein*, 771 S.W.2d 577, 580 (Tex.App.—Dallas 1989, writ denied); *Railroad Comm'n v. Atchison, Topeka,* 609 S.W.2d 641, 643 (Tex.Civ.App.—Austin 1980, writ ref'd n.r.e.). *See State v. Jackson*, 376 S.W.2d 341, 344 (Tex.1964); *Stauffer v. City of San Antonio*, 162 Tex. 13, 344 S.W.2d 158, 160 (1961). "The only requirement is that an agency's rules must be consistent with the laws of this state." *Dallas County Bail Bd. v. Stein*, 771 S.W.2d at 580; *Gerst v. Oak Cliff Savings & Loan Ass'n*, 432 S.W.2d 702, 706 (Tex. 1968). "The determining factor . . . whether . . . a particular administrative agency has exceeded its rule-making powers is that the rule's provisions must be in harmony with the general objectives of the Act involved." *Gerst v. Oak Cliff Savings & Loan Ass'n*, 432 S.W.2d at 706; *State Board of Insurance v. Deffebach*, 631 S.W.2d at 798.

In the preamble to the Rules, the Commission stated that it was adopting the Rules under Texas Natural Resources Code §§ 81.052 (general rulemaking authority),

85.202 (concerning the conservation of oil and gas and the prevention of waste), 86.041–86.042 (concerning the conservation of gas and the prevention of waste), 111.083, 111.090 and 111.133 (authority under the Common Purchaser Act). Tex.R.R. Comm'n, 12 TEX.REG. 536, 537 (1987). The preamble further stated:

> The system embodied in this section is based on the state's statutory authority recognized by the Supreme Court, to conserve its natural resources by preventing waste, protecting correlative rights, and preventing discrimination. This authority is embodied in a comprehensive body of conservation laws (Chapter 86, Texas Natural Resources Code) designed to ensure production of natural gas in accordance with market demand and to prevent its waste.

*Id.* at 536.

Section 85.201 of the Texas Natural Resources Code states that "[t]he commission shall make and enforce rules and orders for the conservation of oil and gas and prevention of waste of oil and gas." Section 85.202(b) of the Texas Natural Resources Code states that "[t]he commission shall do all things necessary for the conservation of oil and gas and prevention of waste of oil and gas and may adopt other rules and orders as may be necessary for those purposes." Section 86.001 of the Texas Natural Resources Code, entitled "Declaration of Policy," states:

> In recognition of past, present, and imminent evils occurring in the production and use of gas as a result of waste in this production and use of gas in the absence of correlative opportunities of owners of gas in a common reservoir to produce and use the gas, the provisions of this chapter are enacted for the protection of public and private interests against these evils by prohibiting waste and compelling ratable production.

Tex.Nat.Res.Code § 86.001. Section 86.011 prohibits waste in the "production, transportation, or use of gas...." Tex.Nat. Res.Code § 86.011. Section 86.041 of the Texas Natural Resources Code states:

The commission has broad discretion in administering the provisions of this chapter and may adopt any rule or order in the manner provided by law that it finds necessary to effectuate the provisions and purposes of this chapter.

Tex.Nat.Res.Code § 86.041. Section 86.042 requires the Commission to "adopt and enforce rules and orders to: (1) conserve and prevent the waste of gas; (2) prevent the waste of gas in drilling and producing operations and in the piping and distribution of gas ... (5) require wells to be drilled and operated in a manner that prevents injury to adjoining property ... [and] (9) otherwise accomplish the purposes of this chapter." Tex.Nat.Res.Code § 86.042.

Section 111.083 provides:

A common purchaser ... shall purchase or take the natural gas purchased or taken by it as a common purchaser under rules prescribed by the commission in the manner, under the inhibitions against discriminations, and subject to the provisions applicable under this chapter to common purchasers of oil.

Tex.Nat.Res.Code § 111.083. Section 111.-090 provides:

The commission shall enforce compliance with this subchapter [and other subchapters and sections] ... and after notice and hearing, may make rules and orders defining the distance that extensions or gathering lines shall be made to all oil or gas wells and other rules or orders that may be necessary to carry out those provisions cited in this section and to prevent discrimination.

Tex.Nat.Res.Code § 111.090. Section 111.-133 provides that "[t]he commission may make rules for the enforcement of the provisions of ... [various subchapters and sections including sections 111.083 and 111.-090]."

## II.

■ The legislature has granted broad discretion to the Commission in administering the laws regulating oil and natural gas. *Stewart v. Humble Oil & Refining Co.,* 377 S.W.2d 830, 834 (Tex.1964) ("[T]he courts have consistently recognized that the Commission must be given discretion in administering the oil and gas statutes."); *Woods Exploration & Producing Co. v. Aluminum Co. of America,* 382 S.W.2d 343, 346 (Tex.Civ.App.—Corpus Christi 1964, writ ref'd n.r.e.) (The Commission "is an administrative body having broad powers and discretion in connection with the subjects of conservation and production of crude petroleum oil and natural gas...."); Tex.Nat.Res.Code § 85.201 ("The commission shall make and enforce rules and orders for the conservation of oil and gas and prevention of waste of oil and gas."); Tex.Nat.Res.Code § 85.202(b) ("The commission shall do all things necessary for the conservation of oil and gas and prevention of waste of oil and gas and may adopt other rules and orders as may be necessary for those purposes."); Tex.Nat. Res.Code § 86.041 ("The commission has broad discretion in administering the provisions of this chapter and may adopt any rule or order ... that it finds necessary to effectuate the provisions and purposes of this chapter."); Tex.Nat.Res.Code § 86.042 ("The commission shall adopt and enforce rules and orders to: (1) conserve and prevent the waste of gas; (2) prevent the waste of gas in drilling and producing operations and in the piping and distribution of gas ... [and] (9) otherwise accomplish the purposes of this chapter."). *See Ex Parte Duncan,* 127 Tex. 507, 95 S.W.2d 675, 679 (1936) ("The duty to carry out the details under the statutes is placed on the Railroad Commission."); *Gulf Land Co. v. Atlantic Refining Co.,* 134 Tex. 59, 131 S.W.2d 73, 81, 85 (1939). *See also Texaco, Inc. v. Railroad Comm'n,* 583 S.W.2d 307, 310 (Tex.1979) ("[T]he Railroad Commission is vested with the power and charged with the duty of regulating the production of oil and gas for the prevention of waste as well as for the protection of correlative rights."); *Burford v. Sun Oil Co.,* 319 U.S. 315, 320–22, 63 S.Ct. 1098, 1100–1102, 87 L.Ed. 1424 (1943). *But see generally Railroad Comm'n of Texas v. City of Austin,* 524 S.W.2d 262, 267 (Tex.1975) ("This Court has generally held that the Commission has only such powers as are *specifically* delegated....") (emphasis in original); *Hum-*

*ble Oil & Refining Co. v. Railroad Comm'n,* 133 Tex. 330, 128 S.W.2d 9, 15 (1939) ("We think that the power to fix prices and make rates by a board or commission is not to be taken as conferred by implication.").[6]

■ In enacting sections 85.201, 85.202, 86.001, 86.011, 86.041, 86.042, 111.090 and 111.133 of the Texas Natural Resources Code, the legislature expressed its intent that the Commission have authority to prevent every kind of wasteful practice, to conserve natural resources, and to prevent discrimination, whether specifically enumerated in the statutes or not. *See Railroad Comm'n v. Shell Oil Co.,* 146 Tex. 286, 206 S.W.2d 235, 241 (1947). In considering the Commission's authority and discretion, this court stated:

> Noteworthy is the phrasing of this last-quoted statute, [article 6029—now section 85.202 of the Texas Natural Resources Code] which begins by directing the Commission to make and enforce rules to prevent the waste of oil and gas, *including,* the statute says, rules for the purposes enumerated. This clearly manifests an intention that the adoption of rules for the nine purposes specified in the act should not exhaust the power of the Commission nor limit its responsibility to prevent waste, but should be included in all other rules which might be found reasonably necessary to that end.
>
> \* \* \* \* \* \*
>
> [O]bviously to be certain that the Commission had authority to prevent every kind of wasteful practice, whether particularly enumerated or not, subsection (8) [now section 85.202(b) of the Texas Natural Resources Code], couched in the most sweeping language, was inserted in Article 6029 [now section 85.202 of the Texas Natural Resources Code]. As general and all-inclusive authorization as can be

pictured is presented not only by the language of this subsection, but generally by the statutes under consideration.[7] It is the plain duty of the courts to give them, within constitutional bounds, a scope no less broad and effective than the legislative intent they so evidently manifest.

*Id.* 206 S.W.2d at 241 (emphasis in original) (footnote added).

■ "By conferring upon an agency the power to make rules and regulations necessary to carry out the purposes of an act, the Legislature forecloses the argument that it intended to spell out the details of regulating the industry." *Dallas County Bail Bond Bd. v. Stein,* 771 S.W.2d at 580; *Texas Liquor Control Bd. v. Super Sav. Stamp Co.,* 303 S.W.2d 536, 540 (Tex.Civ. App.—San Antonio 1957, writ ref'd n.r.e.). When "a statute expressly authorizes an agency to regulate an industry, it impliedly authorizes the agency to promulgate rules and regulations necessary to accomplish such purpose." *Dallas County Bail Bond Bd. v. Stein,* 771 S.W.2d at 580; *Texas Liquor Control Bd. v. Super Sav. Stamp Co.,* 303 S.W.2d at 539.

■ The Commission's purpose in promulgating the Rules was, among other things, to prevent discriminatory production and taking of natural gas, prevent waste, promote conservation, protect correlative rights, and protect the priority system concerning nominations, purchases and production of gas. *See* Tex.R.R. Comm'n, 12 TEX.REG. 536, 536–37 (1987). The Rules enhance the Commission's ability to accomplish these purposes and are "in harmony with the general objectives of the Act involved." *Gerst v. Oak Cliff Savings & Loan Ass'n,* 432 S.W.2d at 706. Consequently, we conclude that the Commission had the statutory authority to promulgate the Rules.

**6.** In sections 85.201, 85.202, 86.041 and 86.042 of the Texas Natural Resources Code, the legislature has specifically delegated broad powers *and* discretion to the Commission concerning the conservation and production of oil and natural gas.

**7.** The "statutes under consideration" included article 6008 (now generally chapter 86 of the Texas Natural Resources Code); article 6014 (now sections 85.045–.047, 85.125 and 85.203); article 6015 (now section 91.015); article 6023 (now sections 81.001, 81.051–.052 and 81.054) and article 6029 (now sections 85.201–.202).

### III.

The Commission argues that the Rules are consistent with its statutory authority. Lone Star and Enserch argue essentially that the Commission cannot proceed by rulemaking but must determine questions concerning waste, discrimination and correlative rights by a contested case proceeding after notice and a hearing. We agree that the Rules are consistent with the Commission's statutory authority and that the Commission is not required to determine questions concerning waste and discrimination by a contested case proceeding.[8]

■ "Unless mandated by statute, the choice by an agency to proceed by general rule or by *ad hoc* adjudication is one that lies primarily in the informed discretion of the agency." *State Board of Insurance v. Deffebach*, 631 S.W.2d 794, 799 (Tex.App.— Austin 1982, writ ref'd n.r.e.) (emphasis in original); *Railroad Comm'n v. Concerned Citizens*, 741 S.W.2d 602, 604 (Tex.App.— Austin 1987, writ dism'd w.o.j.). *See SEC v. Chenery Corp.*, 332 U.S. 194, 202–203, 67 S.Ct. 1575, 1580–81, 91 L.Ed. 1995 (1947). Contrary to Lone Star and Enserch's arguments, the legislature created a "dual" system of oil and natural gas regulation in which the Commission possesses both rulemaking and adjudicatory powers. *See, e.g.,* Tex.Nat.Res.Code §§ 85.041, 85.042, 85.045, 85.201, 85.202, 86.001, 86.011, 86.041, 86.042, 86.082, 86.083, 111.090, 111.091, 111.133. *See generally Madden v. Tex. Bd. of Chiropractic Examiners*, 663 S.W.2d 622, 626 (Tex. App.—Austin 1983, writ ref'd n.r.e.). The Commission is authorized by statute to act by rulemaking, *see, e.g.,* Tex.Nat.Res.Code §§ 85.041, 85.042, 85.051, 85.201, 85.202, 86.001, 86.011, 86.041, 86.042, 111.090, 111.133, and a contested case (or adjudicatory) proceeding, *see, e.g.,* Tex.Nat.Res.Code §§ 86.082, 111.091, in the prevention of waste, promotion of conservation and prevention of discrimination. The statutes authorize the Commission to adopt rules as a framework for regulating the industry and also provide a mechanism for deciding, among other things, questions concerning waste and discrimination in a contested case proceeding.

Concerning prevention of waste and promotion of conservation, section 86.041 states that the "commission has broad discretion in administering the provisions of this chapter ..." and section 86.042 requires the Commission to "adopt and enforce rules and orders to: (1) conserve and prevent the waste of gas; (2) prevent the waste of gas in drilling and producing operations and in the piping and distribution of gas ... (5) require wells to be drilled and operated in a manner that prevents injury to adjoining property ... [and] (9) otherwise accomplish the purposes of this chapter." However, section 86.082 provides that the "commission shall exercise its authority to prevent waste when the presence or imminence of waste is supported by a finding based on the evidence introduced at a hearing after proper notice."

Concerning prevention of discrimination, section 111.083 states that "[a] common purchaser ... shall purchase or take the natural gas purchased or taken by it as a common purchaser under rules prescribed by the commission in the manner, under the inhibitions against discriminations...." Section 111.090 provides that the "commission shall enforce compliance with this subchapter [and other subchapters and sections] ... and ... make ... other rules or orders that may be necessary to carry out those provisions cited in this section and to prevent discrimination." Section 111.133 provides that "[t]he commission may make rules for the enforcement of the provisions of ... [various subchapters and sections including sections 111.083 and 111.090]." However, section 111.091(a) states that the "commission shall make inquiry in each field concerning the connection of various producers, and if discrimination is found to be practiced by a common purchaser, the commission shall issue an order to the common purchaser ... that will prevent the discrimination." Obviously, the Commis-

---

**8.** As a result of the disposition of the other issues, it is not necessary to consider whether the Commission is required by statute to determine questions concerning correlative rights by a contested case proceeding. Thus, we express no opinion on this issue.

sion possesses both rulemaking and adjudicatory powers concerning prevention of waste, promotion of conservation and prevention of discrimination.

 Although the Commission is not required in every instance to utilize rulemaking over a contested case proceeding, it may exercise "informed discretion." However, when "an agency faces the alternative of proceeding by rulemaking or by adjudication, the process of rulemaking should be utilized except in those cases ... [when] there is a danger that its use would frustrate the effective accomplishment of the agency's functions." *State Board of Insurance v. Deffebach,* 631 S.W.2d at 799 (citing 1 F. Cooper, *State Administrative Law* 181 (1965)). *See generally* Ron Beal, *Ad Hoc Rulemaking in Texas: The Scope of Judicial Review,* 42 BAYLOR L.REV. 459 (1990); Ron Beal, *Ad Hoc Rulemaking: Texas Style,* 41 BAYLOR L.REV. 101 (1989). The Commission's purpose in promulgating the Rules was, among other things, to prevent discriminatory production and taking of natural gas, prevent waste and promote conservation. The Rules enhance the Commission's ability to accomplish these purposes and do not "frustrate the effective accomplishment of the ... [Commission's] functions." Consequently, the Commission did not abuse its "informed discretion" when it promulgated the Rules rather than determine the issues by a contested case proceeding. Furthermore, we conclude that the Rules are consistent with the Commission's statutory authority and that the Commission is not required to determine questions concerning waste and discrimination by a contested case proceeding.

## IV.

The Commission argues that the statutory authority to promulgate the Rules contains sufficient guidelines or standards for the exercise of such authority. We agree.

 Although the "legislature has the authority to delegate its powers to agencies established to carry-out legislative purposes ... [,] it must establish reasonable standards to guide the entity to which the powers are delegated. The Texas courts have upheld standards which are quite broad." *State v. Texas Mun. Power Agency,* 565 S.W.2d 258, 273 (Tex.Civ. App.—Houston [1st Dist.] 1978, writ dism'd). *See also Southwestern Sav. & Loan Ass'n v. Falkner,* 160 Tex. 417, 331 S.W.2d 917, 921 (1960). When "the legislature delegates its authority, and establishes broad standards, it may leave to ... [agencies] the making of rules and the determination of facts to establish the basis for the application of the legislative policy. Such standards may be broad ... [when] conditions must be considered which cannot be conveniently investigated by the legislature." *State v. Texas Mun. Power Agency,* 565 S.W.2d at 273; *Housing Authority v. Higginbotham,* 135 Tex. 158, 143 S.W.2d 79, 87 (1940). "It is utterly impossible for the Legislature to meet the demands of every detail in the enactment of laws relating to the production of oil and gas." *Corzelius v. Harrell,* 143 Tex. 509, 186 S.W.2d 961, 964 (1945). *See State v. Texas Mun. Power Agency,* 565 S.W.2d at 273 ("The legislature is not required to set forth in detail all the provisions necessary to govern the agency in the performance of its functions."). "The Legislature ... has authorized the Railroad Commission to handle the details relating to the preservation and conservation of the natural resources of the State." *Corzelius v. Harrell,* 186 S.W.2d at 964; *Brown v. Humble Oil & Refining Co.,* 126 Tex. 296, 83 S.W.2d 935, 940–41 (1935); *Trapp v. Shell Oil Co.,* 145 Tex. 323, 198 S.W.2d 424, 438 (1946).

 The legislature's failure to include every specific detail and anticipate unforeseen circumstances in the statutes which delegate authority to the Commission does not invalidate the statutes for insufficient guidelines or standards. Requiring the legislature to include every detail and anticipate unforeseen circumstances in the statutes which delegate authority to the Commission would defeat the purpose of delegating legislative authority. *See Corzelius v. Harrell,* 186 S.W.2d at 964. The broad standards in the statutes which delegate authority to the Commission include (1) the

prevention of discriminatory production and taking of natural gas, (2) the prevention of waste and (3) the promotion of conservation. *See generally* Tex.Nat.Res. Code §§ 85.041, 85.042, 85.045, 85.046, 85.-201, 85.202, 86.001, 86.011, 86.042, 111.083, 111.090, 111.091. More specifically, sections 111.083, 111.090 and 111.091 provide sufficient standards or guidelines concerning prevention of discriminatory production and taking of natural gas, and sections 85.041, 85.046, 85.202, 86.012, 86.042 include specific standards or guidelines concerning prevention of waste and promotion of conservation. Consequently, we conclude that the statutory authority to promulgate the Rules contains sufficient guidelines or standards for the exercise of such authority and that the Commission has legitimately exercised its statutory authority when it promulgated the Rules.

### V.

Lone Star and Enserch argue that the Rules disregard their separate corporate existence without notice, hearing or evidence. We disagree.

 The Rules do not disregard the separate corporate existence of Lone Star, a pipeline company, and Enserch, an affiliated company (or SMP) of Lone Star. Under the limited circumstances when affiliated purchasers use the same pipeline to transport gas, the Rules give the affiliated purchasers an option of being "treated [and regulated] as a single first purchaser for purposes of nominations and ratability requirements" under Rule 30(a)(1), qualifying as separate first purchasers under Rule 34(h), or seeking a hardship exemption under Rule 34(k). The Rules do not apply to

Lone Star and Enserch if they do not use the same pipeline to transport gas. Furthermore, nothing in the Rules prevents Lone Star and Enserch from operating separately, purchasing gas separately or negotiating contracts separately. Consequently, we conclude that the Rules do not disregard the separate corporate existence of Lone Star and Enserch without notice, hearing or evidence.

### VI.

The Commission argues that the Rules are not preempted by the Natural Gas Act, 15 U.S.C.A. §§ 717–717w (NGA), or the Natural Gas Policy Act of 1978, 15 U.S.C.A. §§ 3301–3342 (NGPA).[9] We agree.

 Under the Supremacy Clause of Article VI of the United States Constitution, Congress has the power to preempt state law. *Northwest Central Pipeline Corp. v. State Corporation Comm'n of Kansas,* 489 U.S. 493, 509, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509, 526–27 (1989). The United States Supreme Court has stated that the courts are to examine congressional intent in determining whether Congress has exercised its preemption power.

In the absence of explicit statutory language signaling an intent to pre-empt, we infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law, *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 67 S.Ct. 1146, 91 L.Ed. 1447 (1947), or where the state law at issue conflicts with federal law, either because it is impossible to comply with both,

---

9. The Rules are directed neither at interstate pipelines nor interstate consumers. The "preamble" to the Rules provide that "[a] Railroad Commission enforcement order will be directed at an interstate pipeline only to regulate production and upon a finding by the commission that the order is not preempted under the particular circumstances by federal law." Tex.R.R.Comm'n, 12 Tex.Reg. 536, 536 (1987). The court of appeals characterized this declaratory judgment action as one challenging the validity of Rules regarding intrastate pipeline systems. 798 S.W.2d at 893. We likewise make such characterization in light of the Commis-

sion's limitation on the applicability of the Rules to intrastate pipelines and note that our result may be different if the Commission applies the Rules to interstate pipelines and interstate affiliates. *See Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi,* 474 U.S. 409, 411, 424 n. 6, 106 S.Ct. 709, 711, 718 n. 6, 88 L.Ed.2d 732, 737, 745 n. 6 (1986); *Exxon Corp. v. Eagerton,* 462 U.S. 176, 184–85, 103 S.Ct. 2296, 2303–03, 76 L.Ed.2d 497, 506–07 (1983); *Northern Natural Gas Co. v. State Corp. Comm'n of Kansas,* 372 U.S. 84, 92–93, 83 S.Ct. 646, 651–52, 9 L.Ed.2d 601, 607–09 (1963).

*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. [132] 142–143, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963), or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives, *Hines v. Davidowitz,* 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941).

*Northwest Central Pipeline Corp.,* 489 U.S. at 509, 109 S.Ct. at 1273.[10] *See Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299–300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316, 325 (1988); *Exxon Corp. v. Eagerton,* 462 U.S. 176, 182, 103 S.Ct. 2296, 2301, 76 L.Ed.2d 497, 505 (1983); *Pacific Gas & Elec. v. Energy Resources Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752, 765 (1983). Thus, preemption may be found when (1) Congress explicitly preempts state law, (2) Congress implicitly preempts state law by indicating an intent to completely occupy a given field or (3) state law conflicts with federal law. Furthermore, "[w]hen Congress legislates in a field traditionally occupied by the States, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *California v. ARC America Corp.,* 490 U.S. 93, 101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94 (1989) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447, 1459 (1947)).

There is little doubt but that under the NGA, the regulation of the intrastate natural gas industry was left to the States. *See Public Utilities Comm'n of Ohio v. United Fuel Gas Co.,* 317 U.S. 456, 467, 63 S.Ct. 369, 375, 87 L.Ed. 396, 402–03 (1943).[11] Until 1978, states unquestionably

---

**10.** In determining whether state natural gas regulations were preempted, the court of appeals identified three "factors" applied by the United States Supreme Court in *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board of Mississippi,* 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986). "These [factors] are: (1) whether the regulation comes within the limits of the comprehensive federal regulatory scheme; (2) whether the state regulation conflicts with the federal interest, expressed by both Acts, in protecting gas consumers by ensuring low gas prices; and (3) whether the regulation is directed at purchasers. *Transco,* 474 U.S. at 420, 423, 106 S.Ct. at 715, 717." 798 S.W.2d at 896. Unfortunately, *Transco* does not clearly or distinctly identify the factors used to determine whether state natural gas regulations are preempted.

In *Transco,* the Court relied upon *Northern Natural Gas Co. v. State Corporation Comm'n,* 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963): Northern Natural's finding of pre-emption thus rests on two considerations. First, Congress had created a comprehensive regulatory scheme, and ratable-take orders fell within the limits of that scheme rather than the category of regulatory questions reserved for the States. Second, in the absence of ratable-take requirements, purchasers would choose a different, and presumably less costly, purchasing pattern. By requiring pipelines to follow the more costly pattern, Kansas' order conflicted with the federal interest in protecting consumers by ensuring low prices.
*Transco,* 474 U.S. at 420, 106 S.Ct. at 715, 88 L.Ed.2d at 743. In addition, the Court stated that "[s]uch measures [to prevent economic and physical waste of natural gas] target producers and production, while ratable-take requirements

are 'aimed directly at interstate purchasers and wholesales for resale.'" 474 U.S. at 419, 106 S.Ct. at 715, 88 L.Ed.2d at 742 (quoting *Northern Natural Gas Co. v. State Corporation Comm'n,* 372 U.S. at 94, 83 S.Ct. at 652, 9 L.Ed.2d at 609). However, while the factors used to determine whether state natural gas regulations are preempted are not clearly or distinctly identified in *Transco,* the "*Transco* factors" are consistent with the factors enumerated in *California v. ARC America Corp.,* 490 U.S. 93, 100–101, 109 S.Ct. 1661, 1665, 104 L.Ed.2d 86, 94 (1989); *Northwest Central Pipeline Corp. v. State Corporation Comm'n of Kansas,* 489 U.S. 493, 509, 109 S.Ct. 1262, 1273, 103 L.Ed.2d 509, 526 (1989); *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 299–300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316, 325 (1988); *Exxon Corp. v. Eagerton,* 462 U.S. 176, 182, 103 S.Ct. 2296, 2301, 76 L.Ed.2d 497, 505 (1983) and *Pacific Gas & Elec. v. Energy Resources Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752, 765 (1983).

**11.** In *Public Utilities Comm'n of Ohio v. United Fuel Gas Co.,* the Supreme Court discussed the legislative intent of the NGA:

It is clear, as the legislative history of the [Natural Gas] Act amply demonstrates, that Congress meant to create a comprehensive scheme of regulation that would be complementary in its operation to that of the states, without any confusion of functions. The Federal Power Commission [now the Federal Energy Regulatory Commission] would exercise jurisdiction over matters in interstate and foreign commerce, to the extent defined in the Act, and local matters would be left to the state regulatory bodies. Congress contemplated a harmonious, dual system of regulation of

possessed exclusive jurisdiction to regulate the intrastate natural gas industry. Based upon this historical federal relinquishment of authority to regulate the intrastate natural gas industry, we start with an assumption that the NGA and NGPA do not preempt the Rules—whether explicitly, implicitly or because they conflict with federal law.

## VII.

■■ The Commission argues that neither the NGA nor the NGPA preempts the Rules with respect to intrastate pipeline companies and intrastate gas marketing companies and that neither the NGA nor the NGPA occupy the entire field of intrastate natural gas regulation. Lone Star and Enserch do not assert that the NGA or NGPA expressly prohibit states from regulating intrastate marketing affiliates. Instead, they argue that Congress comprehensively legislated through the NGPA to occupy the entire field of natural gas purchasing and pricing. We agree that neither the NGA nor the NGPA occupy the entire field of intrastate natural gas regulation. Consequently, Congress has not completely occupied the field of intrastate natural gas regulation so as to preempt the Rules.

States are prohibited from directly regulating the sale, transportation and delivery of gas in wholesale quantities moving in interstate commerce. *Missouri v. Kansas Natural Gas Co.*, 265 U.S. 298, 307–08, 44 S.Ct. 544, 545–46, 68 L.Ed. 1027, 1029–30 (1924). Congress enacted the NGA to fill this regulatory void and occupy the field of interstate transportation and sale of natural gas. *See Northern Natural Gas Co. v. State Corp. Comm'n of Kansas*, 372 U.S. 84, 91, 83 S.Ct. 646, 650, 9 L.Ed.2d 601, 607 (1963) ("Congress enacted a comprehensive scheme of federal regulation of 'all wholesales of natural gas in interstate commerce, whether by a pipeline company or not and whether occurring before, during, or after transmission by an interstate pipeline company.' " (quoting *Phillips Petroleum Co. v. Wisconsin*, 347 U.S. 672, 682–83, 74 S.Ct. 794, 799, 98 L.Ed. 1035, 1047–48 (1954))). The NGA specifically declared that it applied "to the transportation of gas in interstate commerce, to the sale in interstate commerce of natural gas ... and to natural-gas companies engaged in such transportation or sale, *but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.*" 15 U.S.C.A. § 717(b) (West 1976) (emphasis added). Therefore, the NGA did not establish a comprehensive regulatory scheme over intrastate transportation or sales of natural gas or production and gathering of natural gas. Rather, the NGA contemplated a comprehensive dual natural gas regulatory scheme with the federal government exercising jurisdiction over interstate and foreign transportation and sales of natural gas and state regulatory bodies exercising jurisdiction over all intrastate matters. *See Public Utilities Comm'n of Ohio v. United Fuel Gas Co.*, 317 U.S. at 467, 63 S.Ct. at 375.

Congress reasserted its intent that states govern intrastate purchases, transportation and sales of gas (including intrastate pipelines taking delivery of gas from interstate pipelines) when it enacted the Hinshaw Amendment, which overruled the United States Supreme Court decision in *Federal Power Commission v. East Ohio Gas Co.*, 338 U.S. 464, 70 S.Ct. 266, 94 L.Ed. 268 (1950) (holding that an intrastate gas company's taking delivery of gas from an interstate pipeline subjected the intrastate pipeline to Federal Power Commission jurisdiction under the NGA).[12] Thus, after enact-

the natural gas industry—federal and state regulatory bodies operating side by side, each active in its own sphere.

317 U.S. at 467, 63 S.Ct. at 375 (citations omitted).

**12.** The Hinshaw Amendment stated in pertinent part:

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so

ment of the Hinshaw Amendment, even though the natural gas traveled interstate, that alone was insufficient to subject the intrastate pipeline receiving such gas to federal regulatory jurisdiction.

Following the energy shortages of the 1970's, Congress enacted the NGPA "to assure adequate supplies of natural gas at fair prices." *Transcontinental Gas Pipe Line Corp. v. State Oil & Gas Board of Mississippi,* 474 U.S. 409, 421, 106 S.Ct. 709, 716, 88 L.Ed.2d 732, 743 (1986). Congress' chosen means to achieve this goal was to establish an integrated intrastate-interstate natural gas market. *See* Note, *Legislative History of the Natural Gas Policy Act,* 59 TEX.L.REV. 101, 121 (1980). The congressional scheme included federal control—both through regulation and deregulation—of intrastate natural gas pricing. 15 U.S.C.A. §§ 3315(a), 3371–72 (West 1982).

The United States Supreme Court, interpreting the NGPA, held that maximum federal lawful wellhead price controls on intrastate gas effects no special change in the relationship between federal and state regulatory jurisdiction. *See Public Service Comm'n of the State of New York v. Mid-Louisiana Gas Co.,* 463 U.S. 319, 340–41, 103 S.Ct. 3024, 3036, 77 L.Ed.2d 668, 684–85 (1983). Moreover, in enacting the NGPA, "Congress explicitly envisioned that the States would regulate intrastate markets in accordance with the overall national policy." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.,* 459 U.S. 400, 420–21, 103 S.Ct. 697, 709, 74 L.Ed.2d 569, 587 (1983).

■ The only United States Supreme Court case involving state regulation of intrastate pipelines is *Exxon Corp. v. Eagerton,* 462 U.S. 176, 103 S.Ct. 2296, 76 L.Ed.2d 497 (1983). In *Eagerton,* the Supreme Court examined an Alabama statute increasing the severance tax on oil and gas extracted in Alabama and prohibiting pro-

ducers from passing the increase through to consumers. The Supreme Court upheld the pass through prohibition insofar as it applied to producer sales of natural gas in intrastate commerce while at the same time concluding that federal law preempted application of the pass through prohibition to sales of gas in interstate commerce. 462 U.S. at 185–87, 103 S.Ct. at 2302–04. The Court concluded that federal law preempted the pass-through prohibition with regard to interstate producers because it interfered with the Federal Energy Regulatory Commission's (FERC) authority to regulate the wholesale pricing of natural gas in the flow of interstate commerce. 462 U.S. at 185, 103 S.Ct. at 2302–03. With regard to application of the pass-through prohibition to intrastate producers, the Court stated:

> Although ... the NGPA extended federal authority to control prices to the intrastate market, Congress also provided that this extension of federal authority did not deprive the States of the power to establish a price ceiling for intrastate producer sales of gas at a level lower than the federal ceiling.

462 U.S. at 186, 103 S.Ct. at 2303 (citations omitted). We conclude from *Eagerton* that a state regulation may be preempted concerning interstate sales of natural gas but valid concerning intrastate sales of gas because the NGPA gas regulation scheme maintains the complimentary, dual state and federal regulatory scheme. Consequently, we conclude that Congress narrowly regulates intrastate natural gas markets without rendering the entire intrastate pipeline and marketing systems subject to federal regulation to the exclusion of state regulatory bodies. *See* H.R.Conf.Rep. No. 1752, 95th Cong., 2d Sess. 70–71, 107–110 *reprinted in,* 1978 U.S.Code Cong. & Admin.News 7659, 8800, 8987, 9023–26. Insofar as the States can regulate intrastate markets in accordance with the overall national policy, including intrastate natural

received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the pro-

visions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States.

15 U.S.C.A. 717(c) (West 1976) (added by Act of Mar. 27, 1954, ch. 115, 68 Stat. 36 (1954)).

gas sales and transportation, we conclude that Congress has not comprehensively legislated through the NGA or the NGPA to occupy the entire field of intrastate natural gas regulation.

## VIII.

 Recognizing that Congress has not completely occupied the field of intrastate natural gas regulation so as to preempt the Rules, we consider whether the Rules are preempted because they conflict with federal law regulating purchasers' price structures and purchasing patterns. There are two forms of conflict preemption—(1) it is impossible to comply with both the federal and state law and (2) the state law stands as an obstacle to the accomplishment and execution of congressional objectives. *Northwest Central Pipeline Corp.,* 489 U.S. at 509, 109 S.Ct. at 1273. The court of appeals held that the Rules conflict with the federal interest in ensuring low gas prices. The Commission argues that the federal interest in low gas prices is not the only federal interest, that state regulation may impact gas prices and that its Rules were in part promulgated to minimize monopolistic abuses which occurred when SMPs purchased gas from producers on their affiliate's pipeline system. Lone Star and Enserch do not complain that it would be impossible to comply with both the Rules and federal law. Therefore, we will only consider whether the Rules stand as an obstacle to congressional objectives regarding its natural gas policies.

 The NGA "serves to protect consumers of natural gas from the monopoly power of interstate pipelines" and gives FERC "regulatory jurisdiction over the transportation and sale of gas in interstate commerce." *Associated Gas Distribs. v. Federal Energy Regulatory Comm'n,* 899 F.2d 1250, 1254 (D.C.Cir.1990). Additionally, the NGPA was enacted "to assure adequate supplies of natural gas at *fair* prices." *Transcontinental,* 474 U.S. at 421, 106 S.Ct. at 716 (emphasis added).

Although Congress desired "fair prices," it did not require the lowest possible price because the NGPA in fact enacted higher statutory rates for certain categories of gas in order to stimulate natural gas production. *Mid–Louisiana,* 463 U.S. at 335–36, 103 S.Ct. at 3034. Further, even though the Rules may impact natural gas pricing, which is under federal control, "the State's purpose must be to regulate production or other subjects of state jurisdiction, and the means chosen must at least plausibly be related to matters of legitimate state concern." *Northwest Central Pipeline Corp.,* 489 U.S. at 518, 109 S.Ct. at 1278.

The Legislature granted the Commission the power to promulgate orders and rules necessary to prevent discrimination and to prevent monopolistic abuses by common purchasers. Tex.Nat.Res.Code § 111.090. The Commission exercised this power in promulgating these Rules. Prevention of anti-competitive practices among pipeline companies and their SMPs is a relevant concern. *See Associated Gas Distribs.,* 899 F.2d at 1253–54 ("Although some (indeed increasingly many) pipelines face competition for customers from other pipelines, still other pipelines enjoy a monopoly or oligopoly position, because their customers must buy natural gas from them or not at all."). In fact, in 1988,[13] FERC adopted rules establishing a standard of conduct governing relationships between pipeline companies and their marketing affiliates to prevent preferential treatment of an affiliated marketer by an interstate pipeline. Standards of Conduct for Interstate Pipelines with Marketing Affiliates, 18 C.F.R. §§ 161.1–161.3 (1991). These rules apply to interstate pipelines transporting gas for other companies and which are affiliated with a marketing or brokering entity. They do not apply to intrastate pipeline companies and their marketing affiliates. Standards of Conduct for Interstate Pipelines with Marketing Affiliates, 18 C.F.R. §§ 161.1–161.3 (1991). FERC recognized a need to regulate the anti-competitive ef-

---

**13.** 53 Fed.Reg. 22,139, 22,161 (June 14, 1988); 54 Fed.Reg. 52,781, 52,791–92 (December 22, 1989).

fects of interstate pipeline marketing affiliates. In fact, FERC provided the following in the preamble to the proposed rules:

A substantial portion of pipelines' transportation transactions were and are being conducted on behalf of their marketing affiliate, and pipelines have an economic incentive to favor their affiliates. Thus, the potential for abuse was and is significant enough to warrant Commission action. * * * These standards, together with the rule's reporting requirements, give the public and the Commission staff the ability to detect and prevent unlawfully discriminatory activity.

54 Fed.Reg. 52,781, 52,783 (December 22, 1989). No logical reason exists for FERC to exclude intrastate pipeline marketing affiliates from its regulatory scheme other than to evince its belief that states maintain regulatory authority over that natural gas regulatory sphere. Further, given FERC's regulation of anti-competitive practices by interstate pipelines and their special marketing affiliates, the Rules are harmonious with and promote the federal energy policy by restraining anti-competitive and discriminatory activities. Without state regulation consistent with FERC regulation, the monopolistic tendencies of intrastate pipelines would be left unchecked.[14] We conclude that the Rules attempt to regulate a purpose within its jurisdictional sphere and the means it chose to do so plausibly relate to a matter of legitimate state concern. *See Northwest Central Pipeline,* 489 U.S. at 518, 109 S.Ct. at 1278.

■ The court of appeals determined that the Rules conflict with the federal interest in low gas prices. However, the mere fact that state regulation impacts gas prices is insufficient to conclude that the

Rules are preempted. *See Northwest Central Pipeline,* 489 U.S. at 514, 109 S.Ct. at 1276. In *Northwest Central Pipeline,* the Supreme Court held that "there can be little if any regulation of production that might not have at least an incremental effect on the costs of purchasers in some market and contractual situations." 489 U.S. at 514, 109 S.Ct. at 1276. Although the Rules may have an incremental effect on natural gas prices, an incremental effect on price alone is an insufficient basis to preempt the Rules. *See Northwest Central Pipeline,* 489 U.S. at 514–15, 109 S.Ct. at 1276 ("Were each such effect [on practices or costs] treated as triggering conflict pre-emption, this would thoroughly undermine precisely the division of the regulatory field ... and would render Congress' specific grant of power to the States virtually meaningless."). Furthermore, the Supreme Court does not require the lowest price. Only fair prices are required. *Transcontinental,* 474 U.S. at 421, 106 S.Ct. at 716.

In *Northwest Central Pipeline,* Kansas regulated producers by canceling their production allowables when their production was far below the allowable. The Supreme Court upheld the regulation because Kansas was regulating in a field reserved for the States and any effect on price was negligible. *Id.* 489 U.S. at 510–19, 109 S.Ct. at 1273–79. Likewise, the Rules only marginally and indirectly affect the price of natural gas and fit into a regulatory area left to the States—regulation of production in order to prevent waste and discrimination while also promoting conservation.

An important part of this preemption analysis concerns whether the Rules govern (1) the production or gathering of natural gas[15] or (2) the transportation or rates

**14.** In fact, the Legislature has provided in the Gas Utility Regulatory Act that "gas utilities are by definition monopolies in the areas they serve...." Tex.Rev.Civ.Stat.Ann. art. 1446e, § 1.02 (Vernon Supp.1992). In addition, we note that Lone Star and Enserch do not complain that the Rules are inconsistent with the FERC regulations seeking to curb monopolistic tendencies.

**15.** "The terms 'production and gathering' in [the NGA] are sufficient in themselves to reserve to the States not merely 'control over the drilling and spacing of wells and the like,' Colorado Interstate Gas Co. v. FPC, 324 US 581, 603, 89 L Ed 2d 1206, 65 S Ct 829 (1945), but also the power to regulate rates of production over time—a key element, after all, in efforts to prevent waste and protect correlative rights." *Northwest Central Pipeline Corp.,* 489 U.S. at 511, 109 S.Ct. at 1274.

of natural gas. *See Northwest Central Pipeline Corp.*, 489 U.S. at 510–14, 109 S.Ct. at 1273–76. More specifically, whether the Rules primarily regulate (1) rates of gas production or gas producers which fall within the State's traditional authority to regulate rates of production, conserve resources and protect correlative rights or (2) purchasing patterns of interstate pipelines or purchasers of gas for resale after transportation in interstate commerce which fall within the federal regulatory authority over transportation and rates. *Northwest Central Pipeline Corp.*, 489 U.S. at 510–14, 109 S.Ct. at 1273–76; *Transcontinental*, 474 U.S. at 418–21, 106 S.Ct. at 714–16.

▆ Frequently there is a subtle distinction between regulation of (1) rates of gas production or gas producers and (2) purchasing patterns or gas purchasers. However, States may regulate gas production even though it has an incremental effect on purchasing patterns of interstate pipelines. *Northwest Central Pipeline Corp.*, 489 U.S. at 512–15, 109 S.Ct. at 1274–76. In *Northwest Central Pipeline Corp.*, the State Corporation Commission of Kansas (KCC) adopted a regulation "providing for the permanent cancellation of producers' entitlements to Kansas–Hugoton gas." 489 U.S. at 497, 109 S.Ct. at 1267. The regulation was "[d]esigned as a counterweight to market, contractual, and regulatory forces that have led interstate pipelines to cut back purchases from Kansas–Hugoton producers ..." and sought "to encourage timely production of gas quotas by providing that the right to extract assigned amounts of gas will permanently be lost if production is too long delayed." 489 U.S. at 497, 109 S.Ct. at 1267. In other words, the interstate pipelines were using "the Hugoton field for storage while taking gas for current needs from elsewhere." 489 U.S. at 500, 109 S.Ct. at 1269. While acknowledging that the regulation "may result in pipelines making purchasing decisions that have an effect on their cost structures and hence on interstate rates," the Supreme Court stated that the regulation "is directed to the behavior of gas producers, and regulates their rates of production as a means of exercising traditional state control over the conservation of natural resources and the protection of correlative rights." 489 U.S. at 512, 109 S.Ct. at 1275.

In this case, the Commission asserts, among other things, that the Rules were promulgated to prevent discriminatory production and taking of natural gas, prevent waste, promote conservation and protect correlative rights. States may not "attempt to regulate pipelines' purchasing decisions in the mere guise of regulating production." *Northwest Central Pipeline Corp.*, 489 U.S. at 518, 109 S.Ct. at 1278. However, when "state law impacts on matters within [federal] control, the State's purpose must be to regulate production or other subjects of state jurisdiction, and the means chosen must be at least plausibly be related to matters of legitimate state concern." 489 U.S. at 518, 109 S.Ct. at 1278.

In this case, the Commission's purpose in promulgating the Rules was, among other things, to prevent discriminatory production and taking of natural gas and to prevent waste. The regulation of the production and taking of natural gas and the prevention of waste are proper state purposes and fall within the state's traditional regulatory authority. Furthermore, the Rules are plausibly related to their stated and legitimate goal of preventing discriminatory production and taking of natural gas and preventing waste. Consequently, under the circumstances present in this cause, we conclude that the Rules are not preempted by federal law.

### IX.

In summary, we conclude that the Commission had the statutory authority to promulgate the Rules, that the Rules are consistent with the Commission's statutory authority, that the Commission is not required to determine questions concerning waste and discrimination by a contested case proceeding, that the Commission's statutory authority to promulgate the Rules contains sufficient guidelines or standards for the exercise of such authority, that the Rules do not disregard the

separate corporate existence of Lone Star and Enserch without notice, hearing or evidence and that the Rules are not preempted by federal law.

For the reasons explained herein, we reverse the judgment of the court of appeals and render judgment that the Rules are valid.

Concurring opinion on Motion For Rehearing by COOK, J.

DOGGETT and GAMMAGE, JJ., not sitting.

COOK, Justice, concurring.

I join the court's opinion and judgment in this cause. I also write for the following reasons.

As I leave the bench, I hope and pray that each of us who occupies these seats, whether on the district court, the court of appeals or the supreme court will always remember that which is expected of us.

We are merely the temporary guardians of the courts over which we preside. These courts in turn are part of our larger system of justice. These courts are an institution, and we as judges are charged with the responsibility of protecting the dignity of our courts and our profession.

To the attorneys who appear in front of us we have an obligation to treat them with respect, to listen to their arguments, to inform ourselves of the law and to be fair and impartial.

Each of us, whether lawyer or judge, is part of the legal profession. We must never allow ourselves to forget this and our solemn duty to conduct ourselves in a manner that always reflects honor on the profession of law. To that end we must consecrate our minds, our hearts and our very souls.